UNITED STATES of America, Plaintiff-Appellee,

v.

Sadik XHEKA and Beha Xheka, Defendants-Appellants.

Nos. 82–1206, 82–1207.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1982.

Decided April 6, 1983.

Rehearing Denied June 7, 1983.

Donald N. Novelle, Serpico, Novelle, Dvorak & Navigato, Ltd., Chicago, Ill., Robert A. Novelle, Chicago, Ill., for defendants-appellants.

Louis M. Fischer, Crim. Div., Dept. Justice, Washington, D.C., for plaintiff-appellee.

Before PELL and CUDAHY, Circuit Judges, and BONSAL, Senior District Judge.*

PELL, Circuit Judge.

Defendants appeal convictions on charges stemming from a fire that destroyed their downtown Chicago restaurant. Sadik "Sonny" Xheka and Beha "Billy" Xheka were found guilty by a jury of conspiracy to damage or destroy a building used in interstate commerce by means of an explosive in violation of 18 U.S.C. §§ 371, 844(i). Sonny was also convicted of the substantive offense of violation of section 844(i), while co-defendant Chris Callas was acquitted on both counts. Because of the nature of the case, and the plethora of claims advanced by defendants, we will review the facts in some detail.

## I

We must view the evidence in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The evidence presented at trial, if believed by the jury, proved that the following events took place. On July 1, 1976, Wadie Howard, a well-known arsonist, met with Chris Callas in a bar. Howard and Callas had been acquainted for many years. Callas told Howard that he had a friend, named Sonny, who had a problem that Howard could probably solve. Callas asked Howard to pass along some money if he were rewarded for his efforts. Callas did not tell Howard what the nature of Sonny's problem was, but did give him the address of the Bull-n-Bear Restaurant, the restaurant owned by the Xheka brothers.

Two days after this conversation Howard drove to the Bull-n-Bear and asked the bar maid for Sonny. Sadik Xheka appeared

---

* Senior District Judge Dudley B. Bonsal of the Southern District of New York is sitting by designation.

and Howard introduced himself and explained that he had been sent by Callas. Before talking with Howard, Sonny made a brief telephone call. After the call Sonny offered Howard a drink and showed him around the restaurant. Sonny and Howard proceeded to the lower level cooking area where they met Sonny's brother, Billy. Sonny asked Howard to name a price for destroying the premises. Billy and a cook were standing a few feet away during this conversation. Howard said that he would burn the restaurant for $5,000 and expenses. Sonny accepted the offer, stating that "I can afford that because I have a good insurance policy plus an interruption clause in my insurance policy." Howard was given $400 for expenses and agreed to return at a later date to collect the first payment of the $5,000. Billy, who understood and spoke English, said nothing throughout this discussion.

On July 10 Howard returned to the Bull-n-Bear and entered the lower level office with Sonny and Billy. Sonny gave him an envelope containing $2,500 in cash and said that the restaurant had to be totally destroyed by the first of the month. Once again Billy did not participate in the conversation. On July 21 Howard returned to receive the final $2,500. Billy and the cook were present when Howard counted the money. Billy said nothing during the transaction.

The following day Howard went to a junk-yard and purchased two 55-gallon drums, which fortuitously were labeled as fruit juice concentrate. On July 23 Howard filled the drums with gasoline and then drove to the Bull-n-Bear. The maintenance staff at the receiving dock would not allow Howard to deliver the drums to the restaurant, so he enlisted Sonny's aid. The two men obtained a cart and wheeled the containers into the cooking area. Billy and the cook were in the kitchen, and the cook joked that he had never seen cooking oil delivered in that fashion before. On Son-

ny's instructions Howard placed the drums in the wine cellar.

Howard returned to the Bull-n-Bear Saturday night, July 24, and met with Sonny. Sonny gave Howard a key to the restaurant and left. On direct examination Howard testified that he also left, but on cross-examination Howard stated that he had entered the Bull-n-Bear and removed twelve cases of liquor, apparently on the belief that it would be put to better use if he took it than if it were destroyed along with the restaurant.

On July 25, at approximately 10:30 p.m., Howard returned to burn the restaurant. He had not informed Sonny or Billy that this was the date he had chosen for the fire. A few minutes after Howard entered the restaurant the building engineer arrived. Howard let him in and explained that he was the "clean-up man." The engineer examined the air-conditioning and left. Howard spread hand-towels throughout the restaurant and poured out the gasoline. While Howard was preparing the fire, Sonny, Billy, and a white-haired man were sitting in the office playing cards. When Howard finished pouring out the gasoline Sonny suggested to his fellow cardplayers that they leave. Sonny removed some money and insurance papers from the safe, and the three men left the building. Howard then placed one of the gas-soaked towels next to the door, lit the end of the towel and stepped out into the street. As Howard walked toward his car he heard an explosion and breaking glass.

A woman parked across the street from the Bull-n-Bear saw Howard leave the restaurant, and then heard an explosion and saw flames coming from the building. The building engineer testified that he had entered the restaurant twice that night and had seen Howard.[1] The engineer spotted the fire at 12:30 a.m. and pulled the fire alarm.

1. The testimony throughout the trial was contradictory on many details. We will only note those that are relevant and assume, as we must, that the jury resolved the contradictions in the Government's favor. We note, additionally, that most of the inconsistencies were minor and of no real relevance.

The fire investigators determined that the fire had been purposely set. Howard was immediately suspected when his description was given by the engineer and the woman who had seen him leave the fire. When interviewed Sonny denied any knowledge of Howard or of the 55-gallon drums found in the restaurant. After Howard was arrested, however, Sonny refused to sign a complaint.

Howard was arrested on July 26. He called his wife, Barbara Jackson, and told her to call Sonny and arrange a meeting. Jackson was to bring a photograph of Howard as identification and obtain money for bail and attorney's fees from Sonny. Jackson, accompanied by a friend, Jean Thompson, met with Sonny. Because of some confusion regarding the amount of money Howard needed, Jackson and Thompson met with Sonny on two more occasions.

Howard was released on bond on July 28. Shortly thereafter he met with Sonny at a restaurant owned by Shaban Islami. Howard asked for an additional $2,000 for attorney's fees. Islami gave Sonny a bundle of cash from which Sonny gave Howard the needed money. This scenario was repeated a week later when Howard extracted $750 from Sonny for "pocket money."

In December of 1976 the Xhekas filed suit against their insurance company to obtain over $800,000 in compensatory damages. That suit was still pending at the time of trial. Records from the Bull-n-Bear revealed that the restaurant had suffered an actual operating loss of almost $25,000 between March and June of 1976.

The final piece of evidence offered by the Government was a tape recording of a conversation that took place in 1979 between Chris Callas and Howard, who was cooperating with the Government. The gist of the conversation, which will be discussed in detail later, was that Callas thought that the Xhekas should cooperate with Howard so that they could obtain the insurance payment.

Defendants did not testify, but they did present several witnesses. Imaculotta Baki, bookkeeper at the Bull-n-Bear, testified that she had been in the restaurant when the meetings allegedly took place and that Howard had never been in the restaurant. As Callas was acquitted we need not discuss his witnesses, other than to note that one witness testified that the bar in which Howard claimed to have met with Callas had been demolished before July of 1976.

II

Defendants' first contention is that 18 U.S.C. § 844(i) is inapplicable to the facts of this case. In pertinent part section 844(i) provides punishment for "[w]hoever maliciously damages or destroys ... by means of an explosive, any building ... used in interstate or foreign commerce." "Explosive" is defined in section 844(j) as:

> gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes ... detonators, and other detonating agents, smokeless powders, other explosive or incendiary devices within the meaning of paragraph (5) of section 232 of this title, *and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire ... may cause an explosion.* (emphasis added)

The Government proceeded under the theory that the gasoline spread throughout the restaurant, and the fumes it produced, constituted a chemical compound or mechanical mixture possessing the requisite characteristics under paragraph (j). In support of this theory the Government presented expert testimony, by stipulation, that "gasoline is a chemical compound, mechanical mixture or device that contains combustible units or other ingredients in such proportions, quantities or packing that ignition by fire ... may cause an explosion." Evidence was also presented to prove that ignition of the gasoline-soaked trailers had in fact caused an explosion.

Defendants argue that, while their actions may constitute arson in violation of

state law, gasoline poured throughout a building does not fall within the statutory definition of "explosive." A similar contention was rejected by this court in *United States v. Agrillo-Ladlad,* 675 F.2d 905 (7th Cir.1982). In *Agrillo-Ladlad* defendants had destroyed a commercial printing company by spreading naptha-soaked newspaper throughout the building. The process of preparing the fire took two hours, allowing the building to fill with naptha fumes. When ignited the fumes exploded. At trial the Government presented expert testimony that naptha vapors and air form a potentially explosive mixture. After analyzing the history and language of the statute we concluded that this situation was covered by section 844(j).

The legislative history indicates that Congress intended to define broadly the term "explosive" for purposes of the malicious use of explosives section of the Organized Crime Control Act; that Congress realized that state and federal jurisdiction would overlap in certain instances, such as arson cases; and that simple devices using common substances could be used to create an explosive within the meaning of the Act. 675 F.2d at 911.

The Eighth, Tenth and Eleventh Circuits have reached the same conclusion when confronted with facts almost identical to those before us today. *United States v. Hepp,* 656 F.2d 350 (8th Cir.1981) (mixture of methane, a natural gas, and air held to be mechanical mixture within the scope of section 844(j)); *United States v. Poulos,* 667 F.2d 939, 942 (10th Cir.1982) ("any person would conclude that the pouring of gasoline around a room with the intention of igniting it or the fumes with an incendiary device was prohibited by sections 844(i) and (j)"); *United States v. Hewitt,* 663 F.2d 1381 (11th Cir.1981) (10 gallons of gasoline poured down a chimney and ignited is a chemical compound under section 844(j)).

In *United States v. Gere,* 662 F.2d 1291 (9th Cir.1981), the Ninth Circuit rejected this broad interpretation of the term "explosive." In *Gere* the court had not been presented with any expert testimony and did not analyze the legislative history of sections 844(i) and (j). For these reasons we found *Gere* unpersuasive when we decided *Agrillo-Ladlad,* and we find it unpersuasive now. Similarly, we reject the reasoning of *United States v. Birchfield,* 486 F.Supp. 137 (N.D.Tenn.1980).

It is clear that the gasoline poured throughout the Bull-n-Bear was an explosive within the meaning of section 844(j). Wadie Howard testified that preparing the fire took several hours, providing plenty of time for the gasoline fumes to mix with the air and form an explosive mixture. As the court noted in *United States v. Poulos,* 667 F.2d at 942, "It is common knowledge that gasoline is highly combustible and capable of exploding. The government's expert witness testified to the fact that gasoline can be an explosive, and it does fit under this statute." We hold that the gasoline and gasoline-soaked towels, which exploded when ignited, fall within the proscription of 844(i).[2]

### III

Defendants argue that they were denied a fair trial due to prosecutorial misconduct, bias on the part of the trial judge and undue limitations placed upon their cross-examination of Howard. We will examine these contentions seriatim.

#### A. *Prosecutorial Misconduct.*

■ The charge of misconduct by the Government stems from the alleged suppression of exculpatory evidence by the prosecution. In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Court held that "the suppression by the

---

**2.** Our conclusion that "explosive" is to be read broadly is bolstered by the recent amendment of section 844, which is intended "to *clarify* the applicability of offenses involving explosives and fire." (emphasis added) As amended section 844(i) reads: "Whoever maliciously dam-

ages or destroys ... by means of *fire or* an explosive, any building ... used in interstate or foreign commerce" shall be guilty of the proscribed offense. Anti-Arson Act of 1982, Pub.L. 97–298, 96 Stat. 1319 (1982).

prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196. Defendants made a general request for *Brady* material, and now allege that the prosecution failed to fulfill its obligation under *Brady* in the following six instances:

(1) One week before trial Wadie Howard informed the prosecutors that he had taken twelve cases of liquor from the Bull-n-Bear the night before the fire. The prosecutors did not inform defendants of this, nor did they bring it out during direct examination of Howard.[3] During direct examination of the fire investigators, which took place before Howard testified, the prosecution elicited that liquor supplies in the Bull-n-Bear were low at the time of the fire, with the clear implication that defendants had removed it themselves before burning the building. It was only during cross-examination of Howard that the true explanation came out.

(2) One week before trial Howard informed the prosecutors that he had met with Sonny a second time at Islami's restaurant. This was also not brought out during direct examination, but was revealed on cross-examination of Howard. Islami testified that Howard came to his restaurant only once.

(3) Three weeks prior to trial a Government agent showed Barbara Jackson a photo array from which she identified Sonny as the man she had met. Jackson initialed the back of the photograph. The agent then went to Jean Thompson's place of employment and showed her the same photographs. Thompson picked out Sonny's picture and initialed the back. Defense counsel were provided a photostat copy of the front of the photo array, but did not avail themselves of the opportunity to view the

originals or ask whether the women had made an identification. During direct examination Thompson made a positive identification of Sonny, but no mention was made of the previous photographic identification. On cross-examination Thompson was asked how she could be positive that Sonny was the right man when she had not seen him for several years. Thompson replied that she had previously identified his photograph.

Defense counsel objected to Thompson's identification because they had not been informed of the pre-trial identification. The judge excused the jury and held a voir dire to determine whether the photo array was unduly suggestive. Jackson testified that she had called Thompson after the agent left, but before he arrived at Thompson's workplace, and told her about the identification. Thompson, however, denied receiving this phone call or knowing that Jackson had identified Sonny. The court determined that Thompson had not seen Jackson's initials before choosing Sonny's picture, but did not resolve whether Thompson had been aware that Jackson had made an identification. The court ruled that the array was not suggestive and allowed the in-court identification to stand.

(4) Prior to trial the Government provided defendants with a typewritten copy of a statement made by Barbara Jackson, but did not deliver the handwritten copy. The statements differed in that the handwritten version contained the address of the Bull-n-Bear while the typed copy did not. Jackson claimed never to have been to the restaurant. The defense was provided with the handwritten statement during trial and questioned Jackson about her knowledge of the address.

(5) Imaculotta Baki was interviewed by a Government agent two years prior to trial and gave a statement to the effect that

---

**3.** The Government contends that this was unintentional. The record reveals, however, that Howard was led away from this subject during the direct examination. The motive of the prosecutor, regardless of how this incident is characterized, is irrelevant. "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs,* 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

Howard had never been in the Bull-n-Bear during the times he claimed to have met with the Xhekas. The defense was not provided with this statement, but did discover the incident when preparing Baki for trial.

(6) After trial defendants claimed to have discovered the cook Howard had referred to in his testimony, a man named Sam Ross. They made an offer of proof that Ross would testify to being interviewed by a Government agent and repudiate Howard's story.

The arguments advanced by defendants concerning the first five of these instances reveal a misunderstanding of *Brady*. We dealt with a similar misunderstanding in *United States v. McPartlin*, 595 F.2d 1321 (7th Cir.1979), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43, in which the Government during its opening statement first revealed that its principal witness had embezzled large amounts of money from defendants. On appeal, defendants claimed that *Brady* required disclosure of this information before trial. We rejected this argument.

We note initially that *Brady* and its successor, *United States v. Agurs*, 427 U.S. 97 [96 S.Ct. 2392, 49 L.Ed.2d 342] (1976), address a thoroughly different problem than the one before us. The concern of *Agurs* and *Brady* is whether the suppression of exculpatory material until after trial requires that a new trial be given so that the evidence may be considered. The Court in *Agurs* characterized the situations to which *Brady* apply as those involving "the discovery *after trial*, of information which had been known to the prosecution but unknown to the defense." 427 U.S. at 103 [96 S.Ct. at 2397] (emphasis added).

\*     \*     \*     \*     \*     \*

The defendants here, however, do not complain of a total suppression of favorable evidence but merely attack the timing of the disclosure of such evidence.

\*     \*     \*     \*     \*     \*

The appropriate standard to be applied in a case such as this is whether the disclosure came so late as to prevent the defendant from receiving a fair trial. 595 F.2d at 1346. We have consistently followed this approach when the disclosure comes during trial, *see United States v. Allain*, 671 F.2d 248, 255 (7th Cir.1982); *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

While we do not condone the Government's conduct, especially as to avoiding the theft of the liquor during direct examination of Howard, we fail to see how the defense was prejudiced. All of the information became available to defendants during trial, and defense counsel was able to make full use of whatever value it had. If anything, the revelation of various factors on cross—rather than direct—examination made Howard look less credible than he otherwise would have appeared. This situation is similar to that presented in *United States v. Johnson*, 487 F.2d 1318, 1324 (5th Cir.1974), *cert. denied*, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 in which the prosecution attempted, unsuccessfully, to hide that a bargain had been made with a Government witness. The court rejected defendant's *Brady* claim. "In these circumstances we cannot conclude that the prosecution's initial lack of candor deprived appellant of due process. We are not, however, favorably impressed by the prosecution's conduct."

Defendants, although making rhetorical allegations of pervasive prejudice, raise only one instance in which the presentation of their defense was harmed by the timing of the disclosures. They claim that had they been aware of Thompson's pre-trial identification of Sonny they would not have asked her how she could recognize Sonny after several years, and the damaging revelation that she had already identified Sonny's photograph would not have been made. This is not the type of prejudice to which we referred in *McPartlin*. There is no requirement that the Government disclose inculpatory information so the defense will not accidentally bring it out during cross-

examination.[4] If the Government was under a duty to disclose the existence of the photographic identification it was because the defense should be allowed to explore the possible suggestiveness of the identification, which might lead to discovery that the in-court identification was tainted and should be suppressed. In this case, however, the possibility that the photographic line-up was suggestive was fully explored during voir dire and resolved against defendants. Defendants have not raised the issue of suggestiveness on appeal and we decline to review the court's findings on this.

■ The sixth claimed *Brady* violation is more troublesome. Defendants allege that after trial they discovered that Sam Ross, the cook Howard claimed was present during many of the meetings with the Xhekas, would testify that he never saw Howard or the drums of gasoline. Ross would also testify that he provided the Government with this information several years prior to trial. The Government makes several arguments as to why no error occurred. At the outset the Government contends that mere representations by a defense attorney as to the existence of suppressed evidence are insufficient to raise a *Brady* claim and that the proper avenue of relief is a request for a new trial from the district court when defendants have obtained an affidavit proving the truth of their claim. In the context of this case this argument has no merit. The Government attached to its brief a copy of interview notes made when Ross was interrogated by a Government agent. The notes reveal that Ross informed the Government that he was employed as a cook at the Bull-n-Bear until the fire, that he worked from 6 a.m. until 3 p.m. on weekdays, and that he had never seen Howard or the drums of gasoline. This belies any claim that Ross is a figment of defendants' imagination. As the Government has not suggested that Ross was not the only cook meeting Howard's description, we will assume that he is the missing witness.

The Government next contends that this was not *Brady* material because Ross got off work at 3 p.m., while Howard testified that he met with the Xhekas at 4 p.m. This ignores Howard's claim that he spoke with the cook when he delivered the drums of gasoline at 9 a.m. on July 23, 1976, which was a weekday. Ross's statement flatly contradicts this tale. Furthermore, that Ross was not at work during the time Howard places him at the restaurant for the other meetings impeaches Howard's testimony. That Ross's testimony would have aided defendants is beyond dispute, though this does not necessarily require that the Government's failure to provide defendants with this material will result in a new trial.

The Government's main contention is that defendants have no one but themselves to blame for the nonappearance of Ross at trial. The basis of this claim is that defendants "had equal or superior knowledge of Ross' existence. He was, after all, their employee.... A defendant has an obligation to obtain testimony he knows about or that was fully available to him." The fallacy of this argument is that defendants, even if they can be held to know of Ross's existence some years after he left their employ, had no knowledge of what testimony he could give. In all of the cases cited by the Government the defendant was fully aware of the content of the testimony that the witness could have given. That is not true here; only the Government was aware that Ross could give exculpatory testimony. Under these circumstances defendants have not waived their *Brady* claim simply because they did not ferret out every potential witness. While the Government is under no duty to seek out witnesses such as Ross, having found him it was under an obligation to inform defendants of the exculpatory evidence he could provide.

We do not approve of the Government's action in withholding this information. We

---

4. Of course, if the damaging information is contained in a statement made by a witness prior to trial the Government may be required to turn it over to the defense *after* the witness has testified. 18 U.S.C. § 3500. In none of the instances complained of by defendants did the Government possess a statement discoverable under section 3500.

do not believe, however, that this misconduct warrants reversal. *Brady* requires that defendants be given a new trial if a "material" piece of evidence was not presented to the jury due to the Government's failure to reveal its existence to the defense. When the defense makes only a general request for *Brady* material, as was the case here, the test of materiality is whether "the omitted evidence creates a reasonable doubt that did not otherwise exist." *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976). In *Cannon v. Alabama,* 558 F.2d 1211 (5th Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978), the court noted that:

> Applying this standard requires an analysis of the evidence adduced at trial and of the probable impact of the undisclosed information. In this context we cannot merely consider the evidence in the light most favorable to the government but must instead evaluate all the evidence as it would bear on the deliberations of a factfinder. 558 F.2d at 1213–14.

The present case, although perhaps close, is unlike *Cannon,* in which the suppressed evidence clearly damaged the Government's already weak case by providing a positive identification of someone other than defendant as the perpetrator. Had Howard been otherwise unimpeached we might well have been inclined to grant a new trial, but in point of fact the jury chose to believe Howard despite a wealth of impeaching evidence. Defense counsel elicited many previous instances of untruthfulness from Howard as well as his prior criminal background. In addition, defendants presented Ms. Baki, who testified that Howard was not present in the restaurant. Ross's expected testimony simply repeated this evidence, but did not provide any other explanation as to why Howard would set fire to the Bull-n-Bear, which it is uncontested that he did. Although one can speculate as to why Howard would burn the Xhekas' restaurant without their permission the jury chose to believe the most obvious explanation for Howard's actions, that defendants hired him to destroy the restaurant. We are not convinced that the addition of Ross's testimony to the existing abundance of impeaching evidence creates a reasonable doubt.

## B. Judicial Bias

We need spend little time discussing the claim that the actions of the trial court deprived defendants of a fair trial. Of the numerous allegations made regarding conduct by the trial court that defendants allege improperly influenced the jury none have merit. Defendants complain that the court's questioning of Jean Thompson demonstrates "a clear and unambiguous indication of the court's attitude and bias." Because this questioning took place outside the presence of the jury, the claim is meritless. Defendants also claim that the court, over objection, permitted Howard to remain in the courtroom while the relevance of impeaching evidence was discussed, thus allowing Howard to formulate explanations for previous inconsistent statements. We have examined the record in this case with care and can only conclude that this case is based either upon a misrepresentation or misunderstanding of what actually took place. On none of the transcript pages cited by defendants, or anywhere else for that matter, did the judge refuse to exclude Howard while impeaching evidence was discussed. Several of defendants' remaining arguments, which we will not discuss, are based on similar misconstructions of the proceedings during trial.

Defendants also make a catchall complaint concerning the court's "impatience with and disdain for the defense and defense counsel." To the extent that this occurred it was invited by counsel, who insisted upon mentioning the maximum penalty faced by the Xhekas despite the court's admonishment not to do so. Similarly, defense counsel sought to impeach Howard by demonstrating that Howard had pleaded "not guilty" to a criminal charge of which he was in fact guilty. This was clearly improper questioning and understandably drew criticism from the court. We also note that, regardless of the cause

of any impatience or disdain, no harm was done. "The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting." *Glasser v. United States,* 315 U.S. 60, 83, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942).

## C. *Limitations on cross-examination of Howard*

■ Defendants argue that "the court continuously and consistently, during the course of this trial, impeded effective permissible cross-examination, refused to exercise properly judicial discretion and hampered defense counsel in their attempts to put the weight of Wadie Howard's testimony and his credibility to the test." In support of this claim defendants have offered little more than citations to pages of the transcript. Thus, unenlightened by the briefs as to the exact nature of the impermissible restrictions placed upon the cross-examination, we must rely upon our own examination of the record to evaluate this argument.

■ It is undisputed that a trial court has discretion to control the conduct of cross-examination. *Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). We recently noted that "a trial court has wide discretion to limit cross-examination, with the standard on review for the adequacy of cross-examination on bias or motive being whether the jury had sufficient information to make a discriminating appraisal of the witness's bias or motive." *United States v. Hinton,* 683 F.2d 195, 200 (7th Cir.1982).

It is clear from our examination of the record that the trial court did not abuse its discretion in limiting the scope of cross-examination. Few restrictions were placed upon defense counsel, and those that were—such as the prohibition on mentioning the maximum penalty faced by Howard, and the Xhekas—were proper. Defense counsel elicited a great deal of impeaching evidence from Howard, including past crimes and lies. The jury "had sufficient information to make a discriminating appraisal of the witness's bias or motive."

Despite the wide latitude granted to defendants in their examination of Howard they urged the trial court to allow the introduction of extrinsic evidence of Howard's past bad acts. As the evidence was only probative of Howard's credibility the court properly excluded it under Rule 608(b) of the Federal Rules of Evidence, which provides that: "Specific instances of conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence." The court's decision was correct.

## IV

Defendants challenge the admissibility of the tape made of the conversation between Howard and Callas. The conversation took place during July of 1979 at a bar in Chicago. By this time Howard was cooperating with the Government in the investigation of the fire. The crux of the conversation was as follows:

Howard: Have you got a minute where we can talk right quick? The Government come back. I been trying to get in touch with Sonny. Have you heard anything from him?

Callas: I heard he had a restaurant somewhere, I hear. Like I say, if you really want to know, I can find out, I can find out for you.

\*   \*   \*   \*   \*   \*

Howard: Give me a Schlitz. You know the worst thing that you ever did in life to me is introduce me to this guy. This son-of-a-bitch.

Callas: What now? What are they doing to you now? They welch? The cocksuckers!! They should cooperate with you if they want to get their money. They should cooperate with you. Then leave me your number and I'm going to try to, for sure, I'm going to try hard. I got this girl that's coming back in a few weeks. She knows them.

\*   \*   \*   \*   \*   \*

Howard: Yes. I want to talk to 'em.

Callas: Do they get that money?

Howard: Yes, ah no. I don't, I don't think so yet. It's still pending.

Callas: Can they get the money without you?

Howard: I don't think so.

Callas: All right. I think, I think I'm gonna talk to the girl for sure.

█ The court admitted this conversation against all of the defendants as substantive evidence under the so-called "co-conspirator exception" to the rule against hearsay testimony. Fed.R.Evid. 801(d)(2)(E). Under Rule 801(d)(2)(E) a statement is not hearsay if "the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." A statement is admissible under this rule only when the Government has established by a preponderance of the evidence, independent of the statement itself, that (1) a conspiracy existed, (2) that defendants and the declarant were members of the conspiracy, and (3) that the statement was made in the course of the conspiracy. *United States v. Santiago,* 582 F.2d 1128 (7th Cir.1978); *see also United States v. Kendall,* 665 F.2d 126, 131 (7th Cir.1981), *cert. denied,* 102 S.Ct. 1719, 72 L.Ed.2d 140; *United States v. Gil,* 604 F.2d 546 (7th Cir.1979). The Government must also demonstrate that "some reasonable basis exists for concluding that the statement furthered the conspiracy." *United States v. Mackey,* 571 F.2d 376, 383 (7th Cir.1978); *United States v. Kendall,* 665 F.2d at 133.

█ Defendants urge that the court erred in admitting the tape in that (1) the conspiracy ended as soon as the fire was set, and (2) Callas was not a member of any conspiracy at the time of the conversation. Defendants do not question that the Government introduced proof establishing by a preponderance of the evidence the existence of a conspiracy *to burn* the Bull-n-Bear. Their contention is that once this goal was accomplished the conspiracy came to an end and any statements later made by

the conspirators are inadmissible under 801(d)(2)(E). This argument rests upon a misconception of the Government's case.

█ The crucial concern "is the scope of the conspiratorial agreement, for it is that which determines ... the duration of the conspiracy." *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957); *see also United States v. Walker,* 653 F.2d 1343 (9th Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *United States v. Hickey,* 360 F.2d 127, 141 (7th Cir.1966), *cert. denied,* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210. Defendants correctly observe that an agreement to conceal a completed crime does not extend the life of a conspiracy. *Grunewald v. United States,* 353 U.S. at 405, 77 S.Ct. at 974; *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). From this defendants argue that an agreement to conceal the true cause of the fire does not breathe life into this otherwise dead conspiracy. Had defendants conspired to destroy the Bull-n-Bear simply for the joy of destruction this argument would have merit, but that was not the case. The Government alleged in the indictment that "It was also an object of the conspiracy that [the conspirators] conceal ... the true circumstances surrounding the burning of ... the Bull-n-Bear Restaurant, Inc., *in order to facilitate future claims made to the insurer of the Bull-n-Bear.*" (emphasis added). At trial the prosecution established the poor financial condition of the business, Sonny's claim that he could afford to hire Howard because the restaurant was insured, and that the Xhekas were still seeking payment from the insurance company. All of these factors support the theory that recovery of the insurance proceeds was the primary goal of the conspiracy. Indeed, one would be hard pressed to think of any other reason the Xhekas would have for destroying their business.

The goal of obtaining money from the insurance company, which requires that the true nature of the fire remain concealed,

distinguishes this case from those relied upon by defendants. In *Grunewald* the Supreme Court made clear that while an agreement to conceal the crime once the goal has been attained does not lengthen a conspiracy, "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been obtained." 353 U.S. at 405, 77 S.Ct. at 974. By way of illustration the Court distinguished the situation in which kidnappers conceal their crime (and their victim) while waiting for payment of the ransom from that in which the ransom has been paid and the kidnappers continue to conceal their involvement to avoid punishment. In the former, but not the latter, the acts of concealment further the object of the conspiracy—obtaining money—and result in lengthening its duration. The situation here is directly analogous to kidnappers waiting for the fruit of their crime to materialize. The conspiracy continues until defendants obtain the insurance money or abandon their quest. *See also United States v. Walker*, 653 F.2d 1343, 1349 (9th Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *United States v. Knuckles*, 581 F.2d 305 (2nd Cir. 1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659.

We also reject defendants' contention that there was insufficient evidence to tie Callas to the conspiracy at the time of the conversation. The Government's evidence demonstrated that Callas directed Howard to the Xhekas and expected some money in return. When Howard introduced himself to Sonny, Sonny went and made a brief telephone call. It is a fair inference that the call was to Callas to verify Howard's credentials. Once a member of the conspiracy Callas remained a conspirator until he took affirmative steps to withdraw from

the agreement. Even if Callas did nothing to further the purpose of the conspiracy after he sent Howard to see defendants, and even if Callas had, understandably, given up any hope of receiving money from Howard, he remained a conspirator. "Mere cessation of activity in furtherance of the conspiracy does not constitute withdrawal." *United States v. Phillips*, 664 F.2d 971, 1018 (5th Cir.1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Diaz*, 662 F.2d 713 (11th Cir.1981); *United States v. Bastone*, 526 F.2d 971, 988 (7th Cir.1975), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). That Callas was acquitted of involvement in the conspiracy does not retroactively undermine the court's determination that his statements were admissible under 801(d)(2)(E).[5] The standard for determining guilt, proof beyond a reasonable doubt, is not the standard for determining admissibility under the coconspirator exception. *United States v. Gil*, 604 F.2d 546 (7th Cir.1979).

Unlike the determination of whether a conspiracy existed between the Xhekas and Callas, and whether Callas's statement was made in the course of the conspiracy, the issue of whether Callas's statement was in furtherance of the conspiracy must of necessity take into account the contents of the statement.[6] It is clear to us that the purpose of Callas's statements was to keep Howard in the conspiracy, and thereby facilitate the Xhekas' attempt to obtain the insurance proceeds. Although the conversation revealed that Callas was not in communication with the Xhekas in 1979, and did not even know if the insurance claim had been paid, it also demonstrated that he was aware of the need for Howard's cooperation and sought to that end to put Howard in touch with the Xhekas. This suffices to make the conversation in furtherance of the

---

5. The acquittal of Callas despite the introduction of the tape, which was more probative of Callas's guilt than of the Xhekas', indicates that defendants suffered little harm from this evidence even if improperly admitted.

6. As Howard was acting on behalf of the Government there is no question that his statements cannot be admitted under Rule 801(d)(2)(E).

conspiracy. The tape was properly admitted.[7]

## V

During the trial the Government called Shaban Islami as a witness. The court allowed the Government to impeach Islami through the introduction, as substantive evidence, of his previous grand jury testimony. Islami was further impeached by the testimony of a Government agent who related a previous inconsistent statement by Islami. Defendants now challenge the admission of this evidence. This claim is without merit. The trial court found that there were important discrepancies between Islami's trial testimony and his previous statements, and we agree. The Federal Rules of Evidence allow a party to impeach its own witness, and permit that it be done through the introduction of extrinsic evidence. Fed.R.Evid. 607, 613; *United States v. Inendino*, 604 F.2d 458 (7th Cir.1979), *cert. denied*, 444 U.S. 932, 100 S.Ct. 276, 62 L.Ed.2d 190. Islami's grand jury testimony was properly admitted as substantive evidence. Fed.R.Evid. 801(d)(1)(A); *see also United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101, 1108 (7th Cir. 1979), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52.

## VI

Defendants tendered several jury instructions that were rejected by the court. They now allege that the court's failure to give defendants' instructions regarding the credibility of Howard's testimony and the proof needed to convict Beha Xheka of conspiracy was reversible error. We do not agree. The instructions are to be viewed as a whole, and the exact wording of an instruction is left to the discretion of the trial court. *United States v. Kirby*, 587 F.2d 876, 883 (7th Cir.1978); *United States v. Garcia*, 562 F.2d 411, 416 (7th Cir.1977). The court need not give a proposed instruction if the essential points are covered by those that are given.

Defendants complain that the court's instruction on the weight to be given to Howard's testimony was inadequate. The court instructed the jury that Howard was an accomplice, had received benefits from the Government for his role in the investigation and had plead guilty to a criminal charge related to the fire. The instruction concluded: "You may give his testimony such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care." While defendants' proposed instructions may have placed more stress upon the caution with which Howard's testimony was to be viewed, the court's instruction was more than adequate. *See United States v. Kirby*, 587 F.2d at 884. The court also rejected defendants' proposed perjurer instruction. As there was no proof that Howard was a perjurer in the legal sense of that term, the court properly rejected this instruction.

Defendant Beha Xheka tendered an instruction that read: "Mere association with conspirators is not sufficient evidence of guilt of conspiracy." The court rejected this, but did instruct the jury as follows:

In order to establish the offense of conspiracy, the government must prove these elements beyond a reasonable doubt.

\* \* \* \* \* \*

3. That the defendant knowingly and intentionally became a member of the conspiracy.

\* \* \* \* \* \*

---

**7.** Defendants also contend that the tape was of such poor quality that its relevance was outweighed by the possible prejudice. The record reveals that the tape, although originally of poor quality, was enhanced to the point that it was intelligible when played to the jury.

As a final argument defendants claim that admission of the tape violated their Sixth Amendment right to confront witnesses against them. We have rejected the claim that admission of an out-of-court statement under Rule 801(d)(2)(E) violates the confrontation clause previously and we decline to reconsider this view. *United States v. Regilio*, 669 F.2d 1169, 1176 (7th Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982); *United States v. Papia*, 560 F.2d 827, 836 n. 3 (7th Cir.1977); *cf. Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

In determining whether the defendant became a member of the conspiracy you may consider only the acts and statements of that particular defendant.

\* \* \* \* \* \*

The government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that he was aware of the common purpose and was a willing participant.

These instructions were sufficient to apprise the jurors that they must judge each defendant separately and base their decision solely upon his own acts or statements, and that the evidence must prove that the defendant was a participant and not just an observer.

## VII

Both defendants vigorously argue that there was insufficient evidence to support their convictions. In support of this argument defendants focus upon the credibility, or lack thereof, of Howard. It is the role of the jury, and not of this court, to pass upon the credibility of a witness. Howard was not incredible as a matter of law, and "judgment of acquittal ... is not required because the government's case includes testimony by 'an array of scoundrels, liars and brigands.'" *United States v. Hewitt*, 663 F.2d 1381, 1385 (11th Cir.1981) (quoting *United States v. Tiche*, 424 F.Supp. 996, 1000–01 (W.D.Pa.1977), *aff'd mem.*, 564 F.2d 90 (3rd Cir.)). In assessing defendants' claim, then, we must accept the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469.

The claim that the evidence was insufficient to support the conviction of Sadik Xheka is frivolous. There was ample proof of his involvement in the crime, much of which was provided by sources other than Howard. We see no reason for extending this opinion with a review of the Government's case against Sadik.

▆ The case against Beha Xheka is of a different nature. First, Beha argues that his acquittal of the substantive count requires that we view his conspiracy conviction with suspicion. Second, he argues that the jury improperly convicted him of doing nothing to prevent the fire rather than of being a member of the conspiracy. Beha relies upon *United States v. Caro*, 569 F.2d 411, 418 (5th Cir.1978), for his contention that acquittal of the substantive crime with conviction of conspiracy "should engage our judicial skepticism. [And that a] critical analysis of the facts is required when such a contrariety of results does appear." He fails to quote the preceding sentence, in which the court states, "There is nothing necessarily inconsistent, in law or logic, with such a result and we do not hold that a conviction for conspiracy and acquittal of the substantive offense may never properly arise from the same facts and trial." Thus armed with some "judicial skepticism," but fully aware that the jury was not foreclosed from returning this verdict, we examine Beha's second claim.

▆ Before reviewing the evidence against Beha we will set forth the basic principles that guide our decision. Participation in a criminal conspiracy may be shown through circumstantial evidence. *Glasser v. United States*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Hawes*, 529 F.2d 472, 482 (5th Cir.1976). Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. *Id.; cf. Bailey v. United States*, 416 F.2d 1110, 1115 n. 34 (D.C.Cir.1969). Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict. *United States v. Melcher-Lopez*, 627 F.2d 886 (9th Cir.1980). Most important to this case is the well-established rule that mere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. *Id.; United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.1979), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425; *United States v. Baker*, 499 F.2d 845 (7th Cir.1974), *cert. denied*, 419 U.S. 1071, 95 S.Ct. 659, 42

L.Ed.2d 667; *Bailey v. United States,* 416 F.2d 1110 (D.C.Cir.1969). However, while "mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy." *United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir. 1978), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351; *see also United States v. Dalzotto,* 603 F.2d at 645.

The case against Beha consisted of testimony that Beha had listened and observed the negotiations between Sonny and Howard, had joined the two men during a meeting in the office, had witnessed the delivery of the gasoline and had been present when Howard prepared the fire. Beha also stood to gain from the suit filed to collect the insurance proceeds, but he did not inform the insurance company of the true cause of the fire.

Beha argues that proof that he was aware of the conspiracy, and may even have approved of what was happening, does not amount to proof that he was a conspirator. While in many situations mere presence, knowledge, and approval would be insufficient we are not persuaded that that is true here. Beha was not an uninterested bystander, silently cheering the conspirators on. He was part owner of the business that was to be destroyed and the money that was paid to Howard was partly his. This is a far cry from the typical "mere presence" case in which the alleged conspirator has no demonstrated stake in the conspiracy and contributes nothing to its success. *See, e.g. United States v. Caro,* 569 F.2d 411 (5th Cir.1978) (evidence that defendant owned automobile used during drug sale, that a man matching defendant's description spoke with conspirators, and that defendant fled when confronted by Government agents insufficient to support conviction); *United States v. Baker,* 499 F.2d 845 (7th Cir.1974) (proof that defendant lived with conspirator and provided transportation to hotel in which drug sale took place held

insufficient); *Bailey v. United States,* 416 F.2d 1110 (D.C.Cir.1969) (proof that defendant was seen speaking with robber before crime and fled after crime insufficient to establish crime of aiding and abetting). In this situation it may well be enough that defendant intentionally joined Sonny and Howard in the office for one of the meetings, although he was careful to say nothing in Howard's presence. We need not, however, rest our decision upon this point.

As we have discussed elsewhere, the goal of this conspiracy was not the destruction of the Bull-n-Bear, but rather was collection of the insurance proceeds. To accomplish this goal the conspirators needed to conceal their crime. Beha, who was fully aware of the true cause of the fire, did not complain to Sonny when he learned of the plan and did not alert the relevant authorities to prevent the fire. More importantly, Beha joined in the suit against the insurance company, doing nothing to reveal the cause of the fire. As the Second Circuit observed in a similar case, "Where the goal of the conspiracy can be reached only through deception and concealment, silence which is designed to conceal may indicate an intention to conspire." *United States v. Eucker,* 532 F.2d 249, 254 (2nd Cir.1976), *cert. denied,* 429 U.S. 1044, 97 S.Ct. 747, 50 L.Ed.2d 757 (member of brokerage firm who failed to disclose fraud to SEC guilty of conspiracy). Beha was not an innocent by-stander in this situation and could properly be found guilty of conspiracy.

### Conclusion

The trial of the case, and resolution of the issues raised on appeal, required a great deal of time and effort. As is often true in complex conspiracy cases the trial was not perfect, but it was fair. That is all to which the defendants are entitled. Accordingly, the judgments of convictions of the defendants are AFFIRMED.