IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 10, 2017

## STATE OF TENNESSEE v. JERRY REGINALD BURKES

**Appeal from the Criminal Court for Greene County**
**No. 14CR180     Alex Pearson, Judge**

___

**No. E2017-00079-CCA-R3-CD**

___

The defendant, Jerry Reginald Burkes, appeals his convictions of money laundering, theft, and sales tax evasion and the accompanying 18-year effective sentence that included five years of confinement. The defendant argues that (1) the trial court erred by permitting the State to introduce certain evidence in violation of Tennessee Rule of Evidence 404(b); (2) the trial court erred by concluding that certain of the defendant's convictions would be admissible for purposes of Tennessee Rule of Evidence 609; (3) the trial court violated his constitutional privilege against self-incrimination; (4) the State failed to discover and disclose exculpatory evidence; (5) the evidence was insufficient to support a conviction of money laundering; (6) the trial court erred by imposing a Range II sentence; and (7) the sentence imposed by the trial court is illegal. Because the five-year term of confinement imposed by the trial court is not authorized, we vacate the sentencing decision of the trial court and remand the case for resentencing. Additionally, because the amount of restitution ordered by the trial court cannot be satisfied under the terms ordered by the trial court, we vacate the restitution order and remand the case for the trial court to impose restitution in a manner that complies with Code section 40-35-304. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed in Part; Vacated in Part; Remanded**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Greg W. Eichelman, District Public Defender, for the appellant, Jerry Reginald Burkes.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; C. Berkeley Bell, District Attorney General; and Ritchie Collins, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In March 2014, the Greene County Grand Jury issued a presentment charging the defendant with 11 counts of money laundering, one count of forgery, one count of theft of property valued at more than $60,000, and 12 counts of sales tax evasion. After the trial court expressed doubt about the validity of the presentment, the State obtained a superseding presentment charging the defendant with one count of money laundering, one count of forgery, one count of theft of property valued at more than $60,000, and 12 counts of sales tax evasion.[1] The evidence adduced at the defendant's April 2016 trial established that the defendant intentionally failed to remit the required amount of sales tax due in relation to the sales of cigarettes and other tobacco products at his store, Preeminent Skate Specialty, during 2011. The defendant used the retained sales tax money to purchase more cigarettes and tobacco products, which he then sold in the store.

Tennessee Department of Revenue Special Agent Brian McGhee testified that he began investigating Preeminent Skate Specialty in April 2012 after a Department of Revenue audit uncovered a discrepancy between the amount of tobacco products being purchased by the defendant, as reported by those tobacco wholesalers who sold inventory to the defendant, and the amount of sales tax remitted to the department in the monthly sales tax returns during 2011. Agent McGhee began his investigation by obtaining the purchase histories for Preeminent Skate Specialty from S&M Brands, Smith Wholesale, Wholesale Outlet, and Sam's Club, which histories Agent McGhee then "compared . . . to what [the defendant] reported for his taxable sales on his sales tax returns," explaining that it was the department's "theory" that when a business is "continually purchasing inventory on a monthly basis, . . . they are staying in business and . . . continually making sales and . . . generating revenue to be able to continue to purchase inventory and stock their store." Agent McGhee calculated the total inventory purchased for each month and,

---

[1] The trial court apparently believed that the original presentment was invalid because none of the counts had been marked as a true bill. Because a presentment bears the signature of all the grand jurors, however, it is not necessary that it be marked as a true bill in order to be valid. *See Martin v. State*, 155 S.W. 129, 130 (Tenn. 1913); *State v. Muzingo*, 19 Tenn. 112, 113 (1838) ("An indictment is only signed by the foreman of the grand jury, and therefore, unless it appears from the record that the bill was returned by the jury into open court 'a true bill,' it cannot appear that it has been before them, and found by them. Not so in the case of a presentment. That is signed by all the jurors, and we have thus an assurance that they have acted on it and found the facts it presents."); *see also State v. Lawrence Shelton*, No. 03C01-9505-CR-00138 (Tenn. Crim. App., Knoxville, Mar. 13, 1996) ("The requirements for a valid presentment are different from those necessary for a valid indictment. In order to be considered valid, a presentment must, at a minimum, contain the signatures of all twelve grand jurors."); *James Michael Robbins v. State*, No. 03C01-9106-CR-00172 (Tenn. Crim. App., Knoxville, Oct. 29, 1991) (holding that "it is not necessary that a presentment be endorsed as a true bill and that the signatures of 12 Grand Jurors are a sufficient validation").

assuming that the defendant sold as much as he bought, calculated the amount of gross sales. He then subtracted from the gross sales amount the amount of any manufacturer's "buydown," before calculating the amount of sales tax that should have been collected by Preeminent Skate Specialty for each month of 2011.[2]

Agent McGhee made the following findings with regard to the remittance of sales tax by Preeminent Skate Specialty for 2011:

| Month | Inventory Purchased | Buydown Amount | Corrected Gross Sales | Sales Tax Due | Reported Gross Sales | Sales Tax Paid |
|---|---|---|---|---|---|---|
| January | $168,806.89 | $18,582.90 | $150,223.99 | $14,646.84 | $30,108 | $2,935 |
| February | $119,932.37 | $11,838.50 | $108,093.87 | $10,539.15 | $31,783 | $8,098 |
| March | $165,415.52 | $12,049.50 | $153,366.02 | $14,953.19 | $28,261 | $2,755 |
| April | $119,710.74 | $22,626.90 | $97,083.84 | $9,465.67 | $28,841 | $2,812 |
| May | $164,523.14 | $14,235.50 | $150,287.64 | $14,653.04 | $29,063 | $2,834 |
| June | $160,702.25 | $14,262.50 | $151,439.75 | $14,765.38 | $27,448 | $2,677 |
| July | $97,809.18 | $13,730 | $84,079.18 | $8,197.72 | $1,744 | $1,700 |
| August | $164,591.42 | $9,848 | $154,743.42 | $15,087.48 | $18,060 | $1,764 |
| September | $162,923.12 | $10,150.30 | $152,772.82 | $14,895.35 | $21,440 | $2,088 |
| October | $165,466.15 | $14,154.60 | $151,311.55 | $14,752.88 | $21,790 | $2,125 |
| November | $158,783.51 | $14,714.40 | $144,069.11 | $14,046.74 | $18,446 | $1,798 |
| December | $169,251.98 | $16,513.30 | $152,738.68 | $14,892.02 | $15,824 | $1,543 |

Agent McGhee's findings indicated that the defendant failed to remit $11,711.84 in sales tax due in January; $7,441.15 in February; $12,198.19 in March; $6,653.67 in April; $11,819.04 in May; $12,088.38 in June; $6,497.72 in July; $13,323.48 in August; $12,807.35 in September; $12,627.88 in October; $12,248.74 in November; and $13,349.02 in December. The total 2011 shortage was $132,766.46.

Agent McGhee interviewed the defendant for the first time in August 2012, and during that interview, the defendant indicated that he was the owner and manager of Preeminent Skate Specialty and that he alone was "financially responsible for everything at the store." The defendant told Agent McGhee that he paid himself a wage of $4 per hour and that he additionally kept as a sort of "salary" the buydown money he received from Phillip Morris. With regard to the collection of sales tax, the defendant said that at

---

[2] Agent McGhee described a "buydown" as a manufacturer's promotion offered to the retailer in the form of a per-carton or per-item discount and explained that the retailer can choose whether to pass on the discount to the consumer. Agent McGhee explained that buydowns, in contrast to manufacturer's coupons, are deducted from the sales price of an item before any sales tax is calculated.

the end of each day, he placed 10 percent of the cash in the register into one bank bag and then put the remaining cash into another bank bag before taking both bags home with him every evening. When confronted with a previous sales tax return, the defendant admitted that "he had messed up" and said that "he had been putting the wrong amount on the gross sales tax." The defendant told Agent McGhee "that he had been setting aside for sales taxes as gross sales on that line and then taking 10% of 10%."

During that same interview, the defendant told Agent McGhee that he did not "use banks because he didn't trust them." Following the interview, however, Agent McGhee discovered two bank accounts for Preeminent Skate Specialty. A review of the those accounts indicated that the defendant made daily over-the-counter withdrawals so that the amount of money in each account remained essentially static, with low beginning and ending balances for each month of 2011. To be sure, neither bank account contained enough funds at any given time to enable the defendant to purchase inventory and otherwise operate his business without selling the products that he purchased.

Following his interview with the defendant, Agent McGhee confirmed that the defendant made nearly all of the inventory purchases himself, using cash "the majority of the time," and that none of the defendant's suppliers allowed him to purchase products on credit. Agent McGhee visited Preeminent Skate Specialty and did not find any surplus inventory stored on the premises that suggested the defendant was doing anything other than selling the inventory he purchased from the wholesalers. Additionally, he did not find anything during his visit to indicate that the defendant was selling tobacco products at cost. Accordingly, Agent McGhee concluded that the defendant was selling enough tobacco products each month to cover the cost of replacing his inventory using cash. The daily cash withdrawals corroborated these findings.

During a second interview in May 2013, the defendant told Agent McGhee that he was using a different "process that he used for the end of the day procedures and the numbers that he used to complete his sales tax returns" than he was previously. The defendant "described a different process where he actually used numbers off of the z tapes instead of setting aside 10% and putting it in a bank bag and using that number that he took 10% of the gross sales amount erroneously and put that on the sales tax return." The defendant told the agent that he took the contents of the cash register home each night and then deposited the money the next day. The defendant told Agent McGhee that he did not recall telling the agent about the two-bank-bag process in the April 2012 interview. The defendant acknowledged that he used proceeds from the sales at the business to buy new inventory and that he alone was "the manager and financially responsible" for the business. Agent McGhee said that because the defendant was responsible for running the business, collecting the money, making deposits, and purchasing all the product, the defendant should have been "very aware that the sales and

-4-

the sales tax that he was completing on those returns was not adequate for what he was purchasing."

Representatives of two of the suppliers testified that the defendant made nearly daily cash purchases of tobacco products in 2011. The State offered into evidence the records of the defendant's tobacco product inventory purchases for 2011.

Tennessee Department of Revenue tax audit manager Mark See testified that he supervised the Retail Accountability Program ("the program"), a program created in 2012 that required "wholesalers of beer and tobacco to report sales to retailers to the department on a monthly basis." He explained that the program compared the information received from the wholesalers with "what the retailers reported their sales were for the same periods. Then when there [are] big discrepancies, then [the department] sends out assessments" for the difference in sales tax owed. To arrive at the appropriate assessment figure, the law required the program to mark up the wholesale price of tobacco products by eight percent before calculating the sales tax. Additionally, the program provided credit for buydowns when retailers reported them.

Agent See said that the department assessed Preeminent Skate Specialty three times between the time the program began and when the business closed in 2013. He testified that in the fourth quarter of 2012, wholesalers reported sales to the defendant of $262,965 while the defendant reported sales of $30,000 and remitted only $2,925 in sales tax. As a result of this discrepancy, the department issued an assessment of $24,765 for that quarter. For the first quarter of 2013, data received from the wholesalers showed that the defendant made inventory purchases in excess of $316,000, but the defendant reported sales of only $73,340. As a result, the department issued an assessment of $26,155. Finally, in the second quarter of 2013, wholesalers reported that the defendant purchased in excess of $211,000 in inventory, but the defendant reported sales of just over $18,000 and remitted no sales tax at all. According to Agent See, the defendant never provided any buydown information and was thus never given any credit for any buydowns.

Following Agent See's testimony, the pro se defendant elected not to testify but chose to present proof.

Danny Sample testified that he was a customer at Preeminent Skate Specialty and that he struck up a friendship with the defendant, whom he considered a very friendly person.

Based upon this evidence, the jury convicted the defendant as charged of money laundering, theft of property valued at more than $60,000, and 12 counts of sales

tax evasion.[3]  Following a sentencing hearing,[4] the trial court imposed Range II sentences of 18 years each for the defendant's Class B felony convictions of money laundering and theft and sentences of four years for each of the defendant's Class E felony convictions of sales tax evasion.  The court ordered the sentences to be served concurrently and ordered the defendant to serve the effective 18-year sentence as five years' incarceration followed by community corrections placement.  The trial court also imposed the $80,000 in fines recommended by the jury and ordered restitution to the State in the amount of $132,766.46 to be paid in installments of $500 per month following the defendant's release on community corrections.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.  In this appeal, the defendant contends that (1) the trial court erred by permitting the State to introduce certain evidence in violation of Tennessee Rule of Evidence 404(b); (2) the evidence was insufficient to support a conviction of money laundering; (3) the State failed to discover exculpatory evidence in violation of *Brady v. Maryland*; (4) the trial court violated his constitutional privilege against self-incrimination by asking the defendant to reveal during a pretrial hearing the date on which he was released from federal custody; (5) the trial court erred by concluding that certain of the defendant's convictions would be admissible for purposes of Tennessee Rule of Evidence 609; (6) the trial court erred by imposing a Range II sentence; and (7) the sentence imposed by the trial court is illegal.  We consider each claim in turn.

## I.  Evidentiary Issues

The defendant presents three evidentiary challenges.  First, he claims that the trial court erred by permitting the State to introduce evidence of the 2012 and 2013 assessments issued to Preeminent Skate Specialty by the Retail Accountability Program in violation of Tennessee Rule of Evidence 404(b).  Second, he claims that the State failed to discover exculpatory evidence in the form of coupon and buydown information from two companies and then failed to provide that information to him in violation of *Brady v. Maryland*.  Finally, he claims that the trial court erred by concluding that his convictions, which were older than 10 years, would be admissible for purposes of impeachment pursuant to Tennessee Rule of Evidence 609 and, in a related claim, that the trial court violated his constitutional privilege against self-incrimination by asking him to reveal during the hearing to discuss potential Rule 609 evidence the date on which he was released from federal custody.

---

[3]    Prior to trial, the State dismissed that count of the presentment charging the defendant with forgery.

[4]    The defendant requested counsel prior to the sentencing hearing, and the trial court appointed the public defender's office to represent him.

*A. Tennessee Rule of Evidence 404(b)*

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. The rule specifies three prerequisites to admission:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime or bad act. *Id.*, Advisory Comm'n Comments; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997).

When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when there has been an abuse of discretion. *See Thacker,* 164 S.W.3d at 240; *see also DuBose*, 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

Prior to trial, the State moved the trial court to rule on the admissibility of evidence that the defendant had underpaid his sales tax in 2012 and 2013 despite having been warned by Agent McGhee in 2012 that he had previously failed to remit sufficient payments. The State argued that the evidence was admissible to show that the defendant intentionally underreported his monthly gross sales and underpaid sales tax and to show

that the underpayment was not simply an accounting mistake.

At the April 14, 2016 hearing, Agent McGhee testified as he did at trial that he warned the defendant during the August 2012 interview "[t]hat he had under reported his sales and sales tax on his sales tax returns." When the defendant told the agent that he set aside 10 percent of the total sales each day as his "gross sales" "and then took approximately 10 percent of that amount to record as the sales tax," Agent McGhee placed the defendant "on notice" that his accounting method was incorrect. Agent McGhee also encouraged the defendant to attend the "new business owner . . . workshop" offered by the taxpayer services division.

Agent See testified, in keeping with his trial testimony, that the department issued assessments to Preeminent Skate Specialty in "the fourth quarter of 2012, the first quarter of 2013, and the second quarter of 2013."

At the conclusion of the hearing, the trial court deemed the evidence admissible:

> So the [c]ourt finds that the probative nature of the evidence is high and it's not being offered solely as propensity evidence but to show that the defendant didn't make a mistake and that he had an intent to commit the act . . . . So I believe the [S]tate can introduce it.
>
> But, however, with that being said, [the defendant] has certainly asked certain questions about it that I believe the jury can ascertain whether or not they feel like that information is reliable or not. That's the question.
>
> But I think the [S]tate can introduce it for the purposes of showing [it is] lack of mistake, lack of accident, intent, common scheme or pla[n] . . . . So I'm going to allow the [S]tate to introduce it, and I find that it is sufficiently probative and not being offered solely for propensity of evidence based on intent, lack of accident, common scheme or plan, et cetera.
>
> And I do find that even though these acts occurred afterwards, it is the law that you can under the right circumstances use subsequent acts to show intent on previous acts.

The defendant contends that the trial court failed to find that the State had established the other bad acts by clear and convincing evidence and that the probative value of the evidence outweighed the danger of unfair prejudice before admitting the evidence. The State argues that these findings are implicit in the court's ruling and that, in any event, the evidence was admissible under the terms of Rule 404(b) to establish that the defendant acted intentionally.

As our supreme court has observed, "'the plain language' of Rule 404(b) uses the phrase 'other crimes, wrongs, or acts' rather than 'prior crimes, wrongs, or acts,'" thus "permit[ting] the introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate cases." *State v. Elkins*, 102 S.W.3d 578, 584 (Tenn. 2003) (citing *State v. Elendt*, 654 S.W.2d 411, 414 (Tenn. Crim. App. 1983)). When "determining whether to allow the admission of evidence of subsequent crimes, wrongs, or acts in a given case," the trial court "should be mindful of the similarity of the offenses or acts and the proximity in time." *Id.*

> "Subsequent as well as prior collateral offenses can be put in evidence, and from such system, identity or intent can often be shown. The question is one of induction, and the larger the number of consistent facts, the more complete the induction is. The time of the collateral facts is immaterial, provided they are close enough together to indicate that they are a part of the system. A man may be honestly mistaken and have no fraudulent intent if a transaction stands alone, but the probabilities of an honest mistake diminish as the number of similar transactions, indicating a scheme or system, increases."

*Thompson v. State*, 101 S.W.2d 467, 473 (Tenn. 1937) (quoting *Wharton's Criminal Evidence*, vol. 1, pp. 527-30).

Here, evidence that the defendant continued to under report his gross sales and underpay his sales tax even following his meeting with Agent McGhee tended to establish that the defendant acted intentionally and that his failure to remit the appropriate amount of sales tax was not the result of an accounting mistake or misunderstanding. Agent See's testimony established the subsequent acts by clear and convincing evidence, and, in our view, the probative value of this evidence outweighed the danger of unfair prejudice. Although the defendant claims that the admission of the evidence created a danger that the jury would include the amounts of the 2012 and 2013 assessments as part of the aggregated theft charge, the record does not support his claim. In consequence, the

-9-

trial court did not err by admitting this evidence.

## B. Brady v. Maryland

The defendant contends that the State violated the constitutional requirement that it disclose exculpatory evidence by failing to obtain and provide to him records from a North Carolina company called Inmar Coupon Redemption and buydown information from a Virginia Company called JT International. The State avers that no such violation occurred because the information the defendant desired was at no time in the possession of the State.

At trial, the defendant asked Agent McGhee whether, as part of his investigation, he had obtained buydown information from a company called JT International and whether he had obtained coupon information from Inmar Coupon Redemption. Agent McGhee replied that he had sent "an official request to JT International like [he] did the other[]" wholesale suppliers but "received no information back." When asked whether he had obtained coupon information from Inmar Coupon Redemption, Agent McGhee indicated that he was not familiar with the company. The agent also testified that coupon information was irrelevant to the calculation of sales tax due, explaining, "[T]he manufacturer coupon it's different than the buydown, . . . you actually calculate and collect sales tax on the full selling price of the pack of cigarettes and then the discount comes after that."

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Indeed, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a due process violation via the suppression of evidence, the defendant must establish that (1) he "requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not)," (2) "the State suppressed the information," (3) "the information was favorable to" his case, and (4) "the information was material." *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Ritchie*, 480 U.S. at 57 (citations omitted); *see also Bagley*, 473 U.S. at 682.

Importantly, "*Brady* obviously does not apply to information that is not wholly within the control of the prosecution." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *see State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The State has no duty "'to disclose information that the defendant already possesses or is able to obtain'" or "which is not possessed by or under the control of the prosecution or other governmental agency." *Jordan v. State*, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011) (quoting *Marshall*, 845 S.W.2d at 233). The State is also under no obligation "to seek out exculpatory evidence not already in its possession or in the possession of a governmental agency." *Marshall*, 845 S.W.2d at 233 (citing *United States v. Xheka*, 704 F.2d 974, 982 (7th Cir. 1983)). When the defendant knows or should know "'the essential facts permitting him to take advantage of any exculpatory information,'" or when "'the evidence is available . . . from another source,'" there can be no *Brady* violation "because in such cases there is really nothing for the government to disclose." *Coe*, 161 F.3d at 344 (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1989)). "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" *Marshall*, 845 S.W.2d at 233 (quoting *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985)).

Here, the defendant is not entitled to relief because the challenged evidence was not within the exclusive control of the prosecution and was instead equally available to both the defendant and the State through the use of compulsory process.

### C. Tennessee Rule of Evidence 609

The defendant argues that the trial court erred by concluding that his prior felony convictions would be admissible as impeachment evidence because the State failed to establish that the convictions satisfied the prerequisites for admission under Tennessee Rule of Evidence 609. In a related claim, he claims that the trial court's asking him to divulge the date on which he was released from his sentence on the prior convictions during the Rule 609 hearing violated his constitutional privilege against self-

incrimination. The State asserts that the trial court properly concluded that the defendant's prior convictions would be admissible under Rule 609 and that the defendant waived any challenge to the trial court's question regarding his release date by failing to object at trial and by failing to raise the issue in his motion for new trial.

The transcript of pretrial proceedings on April 11, 2016, establishes that the defendant asked the trial court to rule on the "notice of impeaching convictions filed pursuant to Tennessee Rule of Evidence 609 that was also filed by" the State. No copy of this notice appears in the record on appeal. The trial court indicated that the State's notice showed the State's intent to impeach the defendant "with a 1990 cocaine conviction out of the United States District Court of Southern West Virginia and also a separate 1990 conviction of 6.5 grams of cocaine with intent to distribute . . . in Count 2." The defendant objected, arguing that those convictions were stale because "the record reflect[s] that the ten years has elapsed." The court then asked, "When is it you say you were released, Mr. Burkes, when did you get out?" The defendant replied, "February 5, 2005." The trial court took the motion under advisement and, following a brief recess, ruled that the State would be permitted to use the 1990 convictions because the defendant was released from confinement in 2005, less than 10 years before the superseding presentment was issued on November 17, 2014.

Tennessee Rule of Evidence 609 provides, in pertinent part:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:

(1) The witness must be asked about the conviction on cross-examination. If the witness denies having been convicted, the conviction may be established by public record. If the witness denies being the person named in the public record, identity may be established by other evidence.

(2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.

(3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and

-12-

the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed between the date of release from confinement and commencement of the action or prosecution; if the witness was not confined, the ten-year period is measured from the date of conviction rather than release. Evidence of a conviction not qualifying under the preceding sentence is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of the conviction, supported by specific facts and circumstances, substantially outweighs its prejudicial effect.

Tenn. R. Evid. 609(a)-(b). We review the trial court's determination of this issue via an abuse of discretion standard. *State v. Thompson*, 36 S.W.3d 102, 110 (Tenn. Crim. App. 2000).

In our view, the trial court did not err. The defendant was released from confinement in 2005, less than 10 years from the date of the superseding presentment. As the trial court observed, the prior convictions were not similar to those offenses charged in the presentment, mitigating the danger of unfair prejudice.

We agree with the State that the defendant has waived plenary review of his allegation that the trial court erred by asking him to reveal the date he was released from confinement on his most recent conviction by failing to object to the question when it was asked and by failing to raise the issue in his motion for new trial. Perhaps more importantly, however, the record simply does not support the defendant's claim that the trial court's question violated his privilege against self-incrimination because "[n]ot even a shadow of testimonial compulsion upon or enforced communication by the accused was

-13-

involved." *Schmerber v. California*, 384 U.S. 757, 765 (1966). Here, the trial court did not force, coerce, or otherwise compel the defendant to answer any question against his will. Instead, the defendant, while advocating the position that the convictions were stale under the terms of Rule 609, freely and voluntarily divulged the date of his release from confinement. That the defendant acted pro se at trial does not alter our analysis. The defendant was repeatedly offered the assistance of counsel throughout the entire proceeding in the trial court, and he repeatedly and forcefully rejected the offer of even elbow counsel, even going so far as to indicate that he did not want elbow counsel present in the courtroom during any proceeding. In sum, no error attends the trial court's asking the pro se defendant when he was last released from confinement.

## II. Sufficiency

Citing *State v. Jackson*, 124 S.W.3d 139 (Tenn. Crim. App. 2003), the defendant asserts that the evidence adduced at trial was insufficient to support his conviction of money laundering.[5] He does not claim that he did not use the funds saved by underpaying his sales tax to subsidize his tax evasion scheme but instead claims that the State failed to present proof "that a second 'washing' transaction was used to hide the theft." The State contends that money laundering as alleged in the presentment in this case does not require evidence of concealment.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

---

[5] The defendant does not challenge the sufficiency of the evidence supporting the remainder of his convictions.

As alleged in this case, "[i]t is an offense to knowingly use proceeds derived directly or indirectly from a specified unlawful activity with the intent to promote, in whole or in part, the carrying on of a specified unlawful activity." T.C.A. § 39-14-903(b)(1).

> "Knowingly uses or attempts to use proceeds derived directly or indirectly from a specified unlawful activity" means that any person or party to the transaction or act knew that the property or proceeds involved in the transaction or act represented or constituted, either in whole or in part, proceeds from some form, though not necessarily which form, of any criminal offense under the laws of this state, or any other jurisdiction. . . .

*Id.* 39-14-902(3). "'Proceeds' includes gross profits from the commission of any specified unlawful activity . . . acquired or derived, directly or indirectly, from, produced through, realized through or caused by an act or omission." *Id.* § 39-14-902(4). The Code defines "specified unlawful activity" as "any act, including any preparatory or completed offense, committed for financial gain that is punishable as a felony under the laws of this state." *Id.* § 39-14-902(5)(A).

The evidence adduced at trial established that the defendant under reported his gross sales for each month in 2011 and that he failed to remit the appropriate amount of sales tax to the State in each of those months. The evidence also established that the money to purchase inventory for Preeminent Skate Specialty each month could have come from no source other than the sales at the business, including that money that should have been remitted as sales tax to the State. In consequence, the evidence supported a conclusion that the defendant knowingly used the money that he retained by evading his sales tax obligation as the means to continue his scheme to underpay his taxes and illegally retain money that rightfully belonged to the State. Contrary to the defendant's assertion, Code section 39-14-903(b)(1), unlike subsection (a)(1), contains no requirement that the State show the defendant had "the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds." *Compare* T.C.A. § 39-14-903(b)(1) *with id.* § 39-14-903(a)(1). Thus, the evidence was sufficient to support the defendant's conviction of money laundering.

*III. Sentencing*

The defendant makes several attacks on the sentence imposed by the trial court. First, the defendant asserts that the trial court erroneously admitted "mittimus

judgments"[6] to establish two of his prior convictions and failed to conduct an elements analysis of his out-of-state convictions and, as a result, erroneously concluded that he was a Range II offender. The defendant also contends that the trial court erred by ordering a term of five years' incarceration as part of the total effective sentence in violation of Code section 40-35-306. The State contends that the trial court properly found the defendant to be a Range II offender but concedes that the trial court erred by imposing a sentence of split confinement with a five-year term of incarceration.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

## *A. Range Classification*

The defendant contends that the trial court erred by imposing a Range II sentence in this case. Specifically, he argues that when calculating the appropriate range, the trial court erred by considering evidence that was not properly admitted during the sentencing hearing and that the trial court failed to apply the correct test to determine whether the defendant's out-of-state convictions would qualify as felonies in Tennessee. The State avers that the defendant has waived any challenge to the evidence considered by the trial court by failing to object at the sentencing hearing. The State also contends that the trial court did not err by classifying the defendant as a Range II offender.

---

[6] In Tennessee, "[a] mittimus is an affidavit to the sheriff or jailer as to the defendant's sentence" that "serves to direct the jailer or sheriff as to a prisoner's commitment or discharge and is kept by the sheriff, or jailer, under the sheriff's direction. A mittimus is directory in nature; it is not a judgment and does not require a judge's signature." *Clifford L. Taylor v. State*, No. W2003-02198-CCA-R3-PC (Tenn. Crim. App., Jackson, Mar. 11, 2005) (citing T.C.A. § 41-4-106). Similarly, in Connecticut, [t]he mittimus is the warrant by virtue of which a convict is transported to and rightly held in prison." *State v. Lenihan*, 200 A.2d 476, 478 (Conn. 1964); *see* Conn. Gen. Stat. Ann. § 54-98 (West).

As is applicable in this case, "[a] multiple offender is a defendant who has received . . . [a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes." T.C.A. § 40-35-106(a).

> Prior convictions include convictions under the laws of any other state, government or country that, if committed in this state, would have constituted an offense cognizable by the laws of this state. In the event that a felony from a jurisdiction other than Tennessee is not a named felony in this state, the elements of the offense shall be used by the Tennessee court to determine what classification the offense is given.

*Id.* "A defendant who is found by the court beyond a reasonable doubt to be a multiple offender shall receive a sentence within Range II." *Id.* § 40-35-106(c).

At the sentencing hearing, the State asked that the defendant be sentenced as a Range II, multiple offender and indicated that it had filed a notice seeking enhanced punishment and had "certified copies of priors . . . to rely on." Neither the State's notice nor the "certified copies of priors" have been included in the record on appeal. The State also apparently provided the trial court with a copy of the Connecticut statutes under which the defendant had been convicted. The State conceded that, upon an examination of the elements of the underlying offense, the defendant's May 9, 1989 conviction would not have been a felony in Tennessee and could not be used to calculate sentencing range. The State argued that the May 17, 1989 Connecticut conviction for the sale of narcotics, based upon an examination of Connecticut Code section 21a-277, would have been at least a Class C felony under Tennessee law in effect at that time. The State contended that the two federal cocaine convictions would have been Class B felonies but conceded that those convictions should be counted as a single offense.

The defendant objected to the use of any of the out-of-state convictions. He argued that the State had failed to establish beyond a reasonable doubt that the Connecticut conviction would have been a felony utilizing a "factor-to-factor type comparison." The defendant also produced a letter that purported to be from an attorney named Steven Gallagher, who stated that he had assisted the defendant in having the Connecticut convictions "modified" in 2006. Like the certified copies of the defendant's Connecticut convictions, this letter was shared with the State and the trial court but has not been included in the record on appeal. The defendant argued that the information contained in the letter cast doubt upon the continuing validity of the certified copies of convictions that had been presented by the State. The defendant also noted that the

copies provided by the State were "mittimus judgments that were saved at the department of corrections" rather than "certified by a clerk at the courthouse, not the Superior Court of Connecticut." As a result, he claimed, the mittimus judgments are not self-authenticating under Rule 902. As to the federal convictions, the defendant argued that the State had failed to establish that the defendant had been convicted of a crime that would have been a felony if committed in Tennessee, noting that the State had not produced either the portion of the United States Code under which the defendant had been convicted or any of the "facts underlying the case."

The trial court recessed to allow the parties to muster more proof with regard to the admissibility and applicability of the out-of-state convictions. After the State produced the federal statute under which the defendant was convicted, the defendant conceded the application of the federal convictions to the range calculation but continued to object to the admissibility of the copies of the Connecticut judgments offered by the State, arguing that because they were "mittimus from a department of corrections," they did not qualify as "a public record" as that term is used in evidence rule 902. The trial court disagreed with the defendant's characterization of the document offered by the State and stated that it would "consider this a judgment."

At that point, the defendant, citing *State v. Vick*, 242 S.W.3d 792 (Tenn. Crim. App. 2007), argued that the State was required "to show facts to prove the elements, not just necessarily an elemental comparison" before the court could consider an out-of-state conviction when calculating the appropriate sentencing range. The trial court rejected the defendant's argument and found "that the convictions that are presented here today are sufficiently named offenses to be able to ascertain and compare the elements to determine whether or not they are crimes in Tennessee."

The trial court determined that the defendant did have the requisite number of convictions to be considered a Range II offender:

> Well, the [c]ourt finds that the Federal sentences are clearly at
> least class C felonies under Tennessee law as it existed at the
> time of the offense. It was a felony at that time. If you look
> at the punishment that existed, they call it a class X offense at
> that time, but for a schedule two, not less than four years, but
> more than ten years. Well, that's either a C or B felony, one
> or the other. So I do think . . . that that's applicable.
>
> . . . .

-18-

Now, next I need to consider the judgments that have been submitted. We've already addressed the Federal judgments. But now the next one I want to consider is the State of Connecticut Superior Court convictions.

. . . I'm trying to look at this Connecticut law that's been supplied to me. . . .

. . . So it's not more than fifteen years. And then for a second offense, it went to thirty years. Comparing the elements of that statute to the elements of the Tennessee [s]tatute as it existed at the time, the Court is of the opinion that this . . . would be what we would now know as a class B felony. But it's certainly, at a minimum, a class C felony. But doing the elemental analysis on the Connecticut statute, listening to the argument of the parties, I just cannot find that they are not the same.

The defendant first asserts that the trial court erred by considering the presentence report, which included information about the defendant's prior convictions, because it was never admitted into evidence at the sentencing hearing. Code section 40-35-210, however, specifically provides that "the court shall consider" the presentence report in addition to "[t]he evidence, if any, received at the trial and the sentencing hearing." T.C.A. § 40-35-210(b)(1), (2). Here, the presentence report met the statutory requirements for preparation and filing, *see id.* § 40-35-207 (describing information to be included in presentence report); *id.* § -208 (providing time for filing presentence report with the trial court), and it was submitted to the trial court for consideration during the sentencing hearing. The defendant's claim on this issue lacks merit.

The defendant next contends that the trial court erred by considering the certified copies of the judgments for his Connecticut convictions because they were not properly admitted into evidence. He claims that the documents, which he refers to as "mittimus judgments," did not satisfy the requirements of Tennessee Rule of Evidence 902. Additionally, he claims that the court should not have considered the documents because the State did not actually enter them into evidence.

We consider first the defendant's claim that the certified copies of his prior convictions were not actually admitted into evidence. As indicated, the State said that it intended to rely on the certified copies and shared them with the court and the defendant. After hearing the arguments of the parties regarding their admissibility, the trial court stated that it would consider the documents presented by the State and then utilized those

-19-

documents to perform an elements analysis of the convictions. In our view, the trial court's accepting and then utilizing the documents indicates that they had been admitted into evidence.

Although we have concluded that they were admitted into evidence at the sentencing hearing, the documents relied on by the court are not a part of the record on appeal. The defendant, as the appellant, bore the burden to prepare an adequate record for appellate review, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and, in the absence of an adequate record, this court must presume the trial court's ruling was correct, *see State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Without the benefit of those documents in the record, this court cannot consider the defendant's claim that the documents did not satisfy the requirements for admissibility under evidence rule 902.

That being said, admission of the certified copies of conviction, standing alone, did not satisfy the State's burden to establish beyond a reasonable doubt that the defendant's Connecticut conviction of the sale of drugs would have been at least a class D felony in Tennessee. The State cannot rely on the offense's name or the length of sentence imposed but is instead required to show that the offense, as committed by the defendant, would have constituted a felony in Tennessee. *State v. Vick*, 242 S.W.3d 792, 794-95 (Tenn. Crim. App. 2007). Unless the elements of the out-of-state conviction are identical to a Tennessee felony, the State must present facts to indicate that the defendant's criminal conduct would have satisfied the elements of a Tennessee felony. *Id.*

The presentence report lists a number of predominantly misdemeanor convictions for the defendant, but relevant to our inquiry, the report lists two Connecticut convictions with a disposition date of May 17, 1989, and two federal convictions with a disposition date of October 5, 1990. With regard to all these convictions, the presentence report lists both the "charge offense" and the "conviction offense" as "not defined." The defendant's federal convictions are alternative counts of possession with intent to distribute and distribution of crack cocaine, and the disposition is listed as "210 mos in jail, 8 yrs supervised release." The defendant does not challenge the use of the federal convictions. The State indicated that it only sought to utilize the first of the May 17, 1989 Connecticut convictions, for which the presentence report lists a disposition of "sale narcotics: 3 yrs." During the sentencing hearing, the State referred the trial court to Connecticut Code section 21a-277, which provided at the time of the defendant's conviction as follows:

> (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent

-20-

to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marihuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned.

(b) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with intent to sell or dispense, possesses with intent to sell or dispense, offers, gives or administers to another person any controlled substance, except a narcotic substance, or a hallucinogenic substance other than marihuana, except as authorized in this chapter, may, for the first offense, be fined not more than twenty-five thousand dollars or be imprisoned not more than seven years or be both fined and imprisoned; and, for each subsequent offense, may be fined not more than one hundred thousand dollars or be imprisoned not more than fifteen years, or be both fined and imprisoned.

(c) No person shall knowingly possess drug paraphernalia in a drug factory situation as defined by subdivision (20) of section 21a-240 for the unlawful mixing, compounding or otherwise preparing any controlled substance for purposes of violation of this chapter.

Conn. Gen. Stat. Ann. § 21a-277 (West 1988).  Although the presentence report narrows the conviction offense down to the sale of narcotics, the report does not indicate the nature of the narcotics that the defendant sold in order to garner this conviction.  On at least one occasion, the trial court discussed the sale of a specified amount of cocaine, but it is unclear whether the court was referring to the federal convictions or the Connecticut convictions.  Presumably, this information was in the judgment forms, but we have no way of knowing whether this is the case because those documents were not included in

the record on appeal.  That being said, Connecticut defines "narcotic substance" as used in Connecticut Code section 21a-277 as follows:

> "Narcotic substance" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis: (A) Morphine-type: (i) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate which are similar thereto in chemical structure or which are similar thereto in physiological effect and which show a like potential for abuse, which are controlled substances under this chapter unless modified; (ii) any salt, compound, isomer, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (i), but not including the isoquinoline alkaloids of opium; (iii) opium poppy and poppy straw; (B) cocaine-type, coca leaves and any salt, compound, derivative or preparation of coca leaves, and any salt, compound, isomer, derivatives or preparation thereof which is chemically equivalent or identical with any of these substances or which are similar thereto in physiological effect and which show a like potential for abuse, but not including decocainized coca leaves or extractions of coca leaves which do not contain cocaine or ecgonine[.]

Conn. Gen. Stat. Ann. § 21a-240(30).  This definition is nearly identical to the definition of "narcotic drug" provided in our Code:

> "Narcotic drug" means any of the following, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:
>
> (A) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate;
>
> (B) Any salt, compound, isomer, derivative, or preparation thereof that is chemically equivalent or identical with any of

the substances referred to in subdivision (17)(A), but not including the isoquinoline alkaloids of opium;

(C) Opium poppy and poppy straw; and

(D) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, isomer, derivative, or preparation thereof that is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions of coca leaves that do not contain cocaine or ecgonine[.]

T.C.A. § 39-17-402(17). At the time of the defendant's conviction, the sale of a narcotic drug in this state would have been a Class C felony. Because the elements of the defendant's conviction offense line up so clearly with a felony offense in our own Code, it is our view that the State was not required to show the specific facts underlying that conviction to satisfy the requirements of Code section 40-35-106.

Utilizing the defendant's federal conviction for the distribution of cocaine, which would have been a Class C felony, and his Connecticut conviction for the sale of narcotics, which would also have been at least a Class C felony, the State was able to establish beyond a reasonable doubt that the defendant was a Range II offender. Consequently, the trial court did not err by imposing a Range II sentence.

### C. Sentence Length

The defendant contends that the trial court erred by applying certain enhancement factors and by failing to apply certain mitigating factors to arrive at a total effective sentence length of 18 years. We need not tarry long over the defendant's challenge to the enhancement factors because, even assuming the trial court misapplied certain enhancement or mitigating factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Nothing suggests that the trial court "wholly departed" from the Sentencing Act when considering the enhancement and mitigating factors in this case. The defendant is not entitled to relief on this issue.

*D. Manner of Service*

The defendant contends that the trial court erred by ordering a sentence of split confinement to be served as five years' incarceration followed by a placement on community corrections. The State concedes that the trial court erred.

When considering the appropriate manner of service of the defendant's sentence, the trial court found that "the deterrence factor is one primary consideration" and that "efforts have been attempted to rehabilitate [the defendant], and they've not been successful because he was on probation and then he commits serious felonies again." The court concluded that these factors as well as the need to avoid "depreciating the seriousness of the offense" justified a period of confinement. The trial court stated:

> Now, consider whether that should be all incarceration or whether I should consider some type of alternative split sentence because as I've already stated, I don't think that putting you on community corrections, at least, initially – I do think that would depreciate the seriousness of the offense and would not sufficiently serve as a deterrent factor to you and others.

The trial court also expressed an opinion that a sentence of full incarceration was not appropriate in this case. Ultimately, the court sentenced the defendant to "eighteen years, split confinement, five years. The rest will be on community corrections."

The judgment forms for the defendant's Class B felony convictions of theft and money laundering reflect Range II sentences of 18 years with 60 months "to be served prior to release on probation or Community Corrections." The judgment forms for the sales tax evasion convictions reflect only a Range II sentence of four years' incarceration. Despite that the trial court ordered a sentence of split confinement, the judgment forms for all of the defendant's convictions indicate that the defendant is sentenced to the Department of Correction ("TDOC").

At the time of the defendant's offense, Code section 40-35-104 provided that the trial court could impose "[t]he following sentencing alternatives in any appropriate combination" so long as a defendant is "otherwise eligible under" the terms of any given provision:

> (1) Payment of a fine either alone or in addition to any other sentence authorized by this subsection (c);

-24-

(2) Payment of restitution to the victim or victims either alone or in addition to any other sentence authorized by this subsection (c);

(3) A sentence of confinement that is suspended upon a term of probation supervision that may include community service or restitution, or both;

(4) A sentence of periodic confinement that may be served in a local jail or workhouse in conjunction with a term of probation;

(5) A sentence of continuous confinement to be served in a local jail or workhouse in conjunction with a term of probation;

(6) A sentence of continuous confinement in a local jail or workhouse;

(7) Work release in accordance with § 40-35-315;

(8) A sentence of continuous confinement in the department if the conviction is for a felony and the sentence is at least one (1) year, unless:

   (A) The sentence is prohibited by subsection (b); or

   (B) The defendant is convicted of a violation of § 39-14-103, involving property valued at less than one thousand dollars ($1,000), and the defendant is sentenced as an especially mitigated offender as defined in § 40-35-109, or a standard offender as defined in § 40-35-105; or

(9) A sentence to a community based alternative to incarceration in accordance with the provisions, including eligibility requirements, of chapter 36 of this title.

T.C.A. § 40-35-104(b). To be eligible for community corrections placement, a defendant must meet "all of the following minimum criteria":

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related or drug-or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and

(F) Persons who do not demonstrate a pattern of committing violent offenses.

T.C.A. § 40-36-106(a)(1). Code section 40-36-302(b) provides that a community corrections placement "may be used in conjunction with a period of shock incarceration or in conjunction with a term of probation and/or a term of split confinement or periodic confinement as provided in chapter 35 of this title." *Id.* § 40-36-302(b). Code section 40-35-306 provides that "[a] defendant receiving probation may be required to serve a portion of the sentence in continuous confinement *for up to one (1) year* in the local jail or workhouse, with probation for a period of time up to and including the statutory maximum time for the class of the conviction offense." *Id.* § 40-35-306(a) (emphasis added).

The record establishes that the defendant was eligible for a community corrections placement, and a period of incarceration coupled with community corrections placement is an appropriate combination of sentencing alternatives. *See id.* §§ 40-35-104(b); -36-302(b); *State v. Smith*, 898 S.W.2d 742, 746 (Tenn. Crim. App. 1994) ("When sentencing an accused pursuant to the Tennessee Community Corrections Act of 1985, a trial court may release the accused into society immediately, order a designated period of straight incarceration, or order split confinement in the form of weekend sentencing."); *see also State v. Byrd*, 861 S.W.2d 377, 381 (Tenn. Crim. App. 1993) ("[A] court in a particular case is justified in sentencing an eligible offender to community corrections after a period of confinement."). Such a period of shock incarceration or split confinement, however, cannot exceed one year. *See State v. Beard*, 189 S.W.3d 730, 737 (Tenn. Crim. App. 2005) (observing that "the one year limit was

derived from Tennessee Code Annotated section 40-35-306, the statute authorizing a sentence of split confinement of up to one year in jail followed by a period of probation"); *State v. Jimmy D. Johnson*, No. 03C01-9602-CC-00062 (Tenn. Crim. App., Knoxville, Oct. 16, 1997) (observing that the court saw "no reason why the legislature would consider the term of confinement for 'shock' value authorized under the Community Corrections Act to be any different than that allowed for probation"); *see also generally, e.g.*, *State v. Derrick L. Dillard*, No. M2002-03089-CCA-R3-CD (Tenn. Crim. App., Nashville, Jan. 16, 2004) ("If incarceration is imposed as a condition of continuing in the Community Corrections sentence, however, the period of confinement may not exceed one year."); *State v. Robert J. Williams*, No. W2002-02366-CCA-R3-CD (Tenn. Crim. App., Jackson, Apr. 14, 2003) (observing that "in the appropriate case, a defendant may be given as much as one year of shock confinement as a condition of a community corrections sentence"); *State v. Adrian Patterson*, No. M2001-01991-CCA-R3-CD (Tenn. Crim. App., Nashville, Sept. 23, 2002) (stating that "a one year period of confinement may be imposed as a special condition of a community corrections sentence in the appropriate case"). Because the five-year term of confinement was not authorized, we vacate the sentence imposed by the trial court and remand the case for a new sentencing hearing.

We also observe error in the judgment forms regarding the place of the defendant's confinement. Each of the defendant's judgment forms indicates a sentence to TDOC. The law is clear, however, that the place of confinement for the incarcerative portion of a split confinement sentence must be the local jail or workhouse. *See* T.C.A. § 40-35-314(a); *Shorts v. Bartholomew*, 278 S.W.3d 268, 275 (Tenn. 2009) (stating that when a defendant received a sentence of split confinement, the appropriate place of confinement was the local jail or workhouse, "erroneously marked TDOC box notwithstanding"). Thus, the trial court's checking the "TDOC" box on the uniform judgment document in this case was erroneous. *Shorts*, 278 S.W.3d at 275 ("Although the standard judgment form . . . provided an option for sentencing an offender to the county jail or workhouse, with a corresponding option of designating a period of incarceration to be served prior to release . . . , the trial court erroneously checked the box next to 'TDOC' . . . ."). Should the trial court impose a sentence of split confinement upon remand, it should take care that the judgments reflect the place of service of the defendant's one-year period of confinement as the local jail or workhouse.

*E. Restitution*

Although not raised by the parties, we observe plain error in the restitution ordered by the trial court. The defendant did not challenge the amount of restitution requested by the State and agreed that he could pay as much as $500 per month toward restitution. As part of the sentence for the defendant's conviction of theft, the trial court

ordered the defendant to pay $132,766.46 restitution to the Department of Revenue. The court ordered the defendant to pay $500 per month toward this amount following his release from his five-year period of confinement. Even if the defendant fully complies with the payment plan as originally ordered by the trial court, he will have paid only $102,000 by the end of his sentence.

When the trial court orders the payment of restitution, it must satisfy the requirements in Code section 40-35-304. *See id.* § 40-35-304(g) ("The procedure for a defendant sentenced to pay restitution pursuant to § 40-35-104(c)(2), or otherwise, shall be the same as is provided in this section with" certain statutory exceptions not applicable here.). The trial court "may permit payment or performance in installments," but "any payment or performance schedule established by the court shall not extend beyond the expiration date" of the defendant's sentence. *Id.* § 40-35-304(c), (g)(2); *see State v. Comer*, 278 S.W.3d 758, 761-62 (Tenn. Crim. App. 2008) ("The court may not, however, establish a payment or schedule extending beyond the expiration of the sentence."). Although "any unpaid portion" of the restitution ordered "may be converted to a civil judgment," T.C.A. § 40-35-304(h)(1); *State v. Bottoms*, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001), the amount as originally ordered must comply with the requirements of Code section 40-35-304. Because the defendant cannot satisfy the total amount of restitution ordered before the expiration of his sentence by following the performance schedule set by the trial court, the restitution order must be modified. Upon remand, the trial court must either modify the total amount of restitution to reflect an amount that the defendant can satisfy within the previously-established performance schedule or upwardly adjust the monthly installment to be paid by the defendant so that he can satisfy the total amount of restitution before the end of his sentence. Given the current state of the record, before the trial court could upwardly adjust the monthly installment, the court would be required to specifically consider the defendant's ability to pay more than $500 per month.

*Conclusion*

Because the five-year term of confinement imposed in this case was not authorized, we vacate the sentencing decision of the trial court and remand the case for resentencing. Because the restitution order in this case does not comply with the requirements of Code section 40-35-304, the case must be remanded for a modification of that order to one that the defendant can satisfy before the expiration of his sentence. The judgments of the trial court are affirmed in all other respects.

_____
JAMES CURWOOD WITT, JR., JUDGE