FILED

06/28/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2018 Session

## STATE OF TENNESSEE v. DENTON JONES

**Appeal from the Criminal Court for Knox County**
**No. 105473    Scott Green, Judge**

_____

### No. E2017-00535-CCA-R3-CD

_____

The defendant, Denton Jones, appeals his Knox County Criminal Court jury conviction of theft of property valued at $1,000 or more, arguing that the State should not have been permitted to aggregate into a single count of theft the value of property taken on five separate occasions from two different locations; that the trial court erred by permitting testimony concerning evidence that suggested the defendant had committed other offenses; that the trial court erred by denying his motions for mistrial, including one based upon an alleged violation of *Brady v. Maryland*; that the evidence was insufficient to support his conviction; and that the cumulative effect of the errors at trial entitle him to a new trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Robert L. Jolley, Jr., and Megan A. Swain, Knoxville, Tennessee, for the appellant, Denton Jones.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Knox County Grand Jury charged the defendant with theft of property valued at $1,000 or more but less than $10,000 from Target between April 28 and May 12, 2014.

At the defendant's December 2016 trial, Frederick Joe Smith, executive team leader for asset protection at the Parkside Drive Target in Knoxville testified that on April 28, April 30, and May 10, 2014, the defendant entered the store and took fitness trackers without paying for them. Mr. Smith said that because fitness trackers were regarded as high-value, high-theft items, they were placed on a "perpetual inventory log" or "PIT log" maintained by the asset protection department at the Parkside Drive Target. He explained that the PIT log contained the item numbers, prices, and building locations of 50 such items and that items purchased by customers were automatically removed from the PIT log. In addition to being placed on the PIT log, fitness trackers were outfitted with spider wrap, hung from "a locking peg hook," and placed under constant video surveillance.

On April 28, 2014, Mr. Smith observed spider wrap for two fitness trackers "just hanging on the locking peg hook" in the sporting goods area, so he decided to watch the video surveillance recording for that area. Mr. Smith explained that the video, which was exhibited to Mr. Smith's testimony and played for the jury, showed a man later identified as the defendant wearing an "Under Armour hat and hooded sweatshirt." The defendant worked the fitness trackers free from the spider wrap, placed them behind other merchandise on a nearby shelf, and then left the area. He walked back to the area shortly thereafter, retrieved the items, and concealed them on his person. After watching the video, Mr. Smith checked the PIT log and determined that two fitness trackers were missing. Store records indicated that neither had been purchased by a customer. The value of the two fitness trackers was $199.98.

On April 30, 2014, Mr. Smith again observed empty spider wrap hanging from a locking peg hook, and, again, video surveillance showed the defendant, who was "wearing the same hooded sweatshirt and the same hat," removing the spider wrap from three fitness trackers and placing each item behind other merchandise on a nearby shelf before coming back to retrieve all of the fitness trackers and conceal them on his person. Again, the PIT log reflected that the defendant had not purchased the items, which had a total value of $329.97.

On May 10, 2014, Mr. Smith again observed empty spider wrap hanging from a locking peg hook, and, again, video surveillance showed the defendant, who was "wearing basically the same hat, shorts, and shoes," going through the same process to take two fitness trackers worth a total of $259.98.

On May 12, 2014, Mr. Smith had an occasion to observe the defendant begin his process firsthand. When another customer interrupted him, the defendant left the store before completing the process, and Mr. Smith followed him to the parking lot,

where he recorded the license tag number for the silver sedan that the defendant had been seen entering after each previous theft.

During cross-examination, Mr. Smith acknowledged that he had no documentation other than his own notes to establish the value of the items taken from the Target. He also acknowledged that he did not contact the police at the time of each taking, stating that he waited until he could positively identify the perpetrator.

Jim Elliott, the former asset protection team leader at the Town Center Boulevard Target, testified that on April 30, 2014, he observed fitness trackers "missing off of the peg hooks." Mr. Elliott watched the video surveillance footage from the sporting goods area and saw the defendant "bend down in front of the [fitness trackers], defeat the spider wraps, take them, put them . . . behind the weights, and he looked around and made sure nobody was around, picked them up, concealed them, and left." The total retail value of the two fitness trackers taken on this occasion was $259.98.

On May 12, 2014, Mr. Elliot again observed a fitness tracker missing from its spider wrap, and when he watched the video surveillance footage from the area, he observed the defendant engage in the same process to take the fitness tracker, which had a value of $129.99.

Mike Adams, owner of Red Rhino, "a buy, sale, trade second hand store," testified that part of his business was the purchase and resale of fitness trackers. He said that those individuals selling items to Red Rhino were required to present their driver's licenses and that, after purchasing an item from an individual, his employees were required to "enter it into LEIDS online," which Mr. Adams described as "a database for the police department to make sure if the item is stolen or something like that." He explained that the employee would use the seller's driver's license "to auto-populate different fields" and then add a description of each item sold during a particular transaction. Mr. Adams said that his records indicated that the defendant had sold fitness trackers to Red Rhino during April and May of 2014. He said that Red Rhino paid the defendant $30 for each of the fitness trackers and would have resold them "in the $60.00 to $70.00 range." He said that, "[b]ased upon the price paid, those would be new or new in box items."

During cross-examination, Mr. Adams testified that employees were required by law to record the seller's race into LEIDS and acknowledged that some of the LEIDS entries for the defendant indicated his race as African American even though he is Caucasian, explaining that the entries were "most likely a clerical error."

Knoxville Police Department Officer Tom Epps testified that he was contacted by Target to investigate a series of thefts at the Parkside Drive and Town Center Boulevard locations. Officer Epps examined Target's records and reviewed the video surveillance recordings. He searched the defendant's name in the LEIDS database, which showed that the defendant had sold fitness trackers to Red Rhino.

Following Officer Epps's testimony, the State rested, and, following a full *Momon* colloquy, the defendant elected not to testify and chose not to present any proof. The jury convicted the defendant of theft of property valued at $1,000 or more but less than $10,000. Following a January 2017 sentencing hearing, the trial court sentenced the defendant, a career offender, to a six-year Class E felony sentence.

In this timely appeal, the defendant challenges the State's aggregation of the value of the property taken during the five thefts, the admission of certain evidence, the denial of his motions for a mistrial, and the sufficiency of the convicting evidence. He also argues that the cumulative effect of the errors at trial entitle him to a new trial. We consider each claim in turn.

*I. Aggregation*

The defendant contends that the trial court erroneously determined that Code section 39-14-105 permitted the State to aggregate the value of the property taken during the separate thefts in this case. The State asserts that the plain language of the 2012 amendment to the statute permitted the aggregation of value in this case.

Because our determination of the propriety of the aggregation of value in this case depends upon our interpretation of Code section 39-14-105, our review is de novo with no presumption of correctness afforded to the ruling of the trial court. *See, e.g., State v. Howard*, 504 S.W.3d 260, 267 (Tenn. 2016).

The most basic principle of statutory construction is "'to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope.'" *Houghton v. Aramark Educ. Res., Inc.*, 90 S.W.3d 676, 678 (Tenn. 2002) (quoting *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995)). "Legislative intent is determined 'from the natural and ordinary meaning of the statutory language within the context of the entire statute without any forced or subtle construction that would extend or limit the statute's meaning.'" *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004) (quoting *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000)). "When the statutory language is clear and unambiguous, we apply the plain language in its normal and accepted use." *Boarman v. Jaynes*, 109 S.W.3d 286, 291 (Tenn. 2003) (citing *State v. Nelson*, 23 S.W.3d 270, 271 (Tenn. 2000)). "It is only when a statute is ambiguous

that we may reference the broader statutory scheme, the history of the legislation, or other sources." *In re Estate of Davis*, 308 S.W.3d 832, 837 (Tenn. 2010) (citing *Parks v. Tenn. Mun. League Risk Mgmt. Pool*, 974 S.W.2d 677, 679 (Tenn. 1998)).

At the time of the offenses in this case, Code section 39-14-105 provided, in pertinent part:

> (b)(1) In a prosecution for theft of property, theft of services, and any offense for which the punishment is determined pursuant to this section, the state may charge multiple criminal acts committed against one (1) or more victims as a single count if the criminal acts arise from a common scheme, purpose, intent or enterprise.
> (2) The monetary value of property from multiple criminal acts which are charged in a single count of theft of property shall be aggregated to establish value under this section.

T.C.A. § 39-14-105(b)(1)-(2).

The defendant argues on appeal as he did in the trial court that this language is merely an expression of the rule previously stated by our supreme court that "[a]ggregation of separate thefts is generally permissible where separate larcenous acts are: (1) from the same owner[s]; (2) from the same location; and (3) pursuant to a continuing criminal impulse or a single sustained larcenous scheme," *see State v. Byrd*, 968 S.W.2d 290, 291 (Tenn. 1998), or "when a defendant exercises simultaneous possession or control over stolen property belonging to different owners," *id.* at 292. The defendant also points to the legislative history of the 2012 amendment to Code section 39-14-105 as evidence that the legislature did not intend to expand the circumstances under which routine thefts could be aggregated but was instead designed solely to punish "Ponzi schemes." The State contends that the plain language of the statute alters the rule expressed in the case law.

We begin, as we must, with the plain language of the statute. At issue in this case is that portion of the 2012 amendment to Code section 39-14-105 that added subsection (b). New subsection (b)(1) specifically permits the State to "charge multiple criminal acts committed against one (1) or more victims as a single count if the criminal acts arise from a common scheme, purpose, intent or enterprise." T.C.A. § 39-14-105(b)(1).

Prior to the passage of the 2012 amendment, the value of property taken during multiple thefts from a single owner could be aggregated only when the "separate

larcenous acts" occurred "pursuant to a continuing criminal impulse or a single sustained larcenous scheme" *and* "from the same location." *Byrd*, 968 S.W.2d at 291. Code section 39-14-105(b)(1) permits aggregation when the State can establish that "the criminal acts arise from a common scheme, purpose, intent or enterprise," *see* T.C.A. § 39-14-105(b)(1), but does not require that the takings occurred "from the same location."

Importantly, "[t]he legislature is presumed to know the state of existing case law," *State v. Powers*, 101 S.W.3d 383, 394 (Tenn. 2003), and this court "must 'presume that the legislature says in a statute what it means and means in a statute what it says there,'" *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (quoting *BellSouth Telecommunications, Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). Although the "[r]ules of the common law are not repealed by implication," *Monk v. Ramsey*, 443 S.W.2d 653, 655 (Tenn. 1969), "[w]hen there is a conflict between the common law and a statute, the provision[s] of the statute must prevail," *Graves v. Illinois Cent. R. Co.*, 148 S.W. 239, 242 (1912). "When statutory language is clear and unambiguous," a reviewing court is required to "apply its plain meaning in its normal and accepted use, without a forced interpretation that would extend the meaning of the language and, in that instance, we enforce the language without reference to the broader statutory intent, legislative history, or other sources." *Carter v. Bell*, 279 S.W.3d 560, 564 (Tenn. 2009) (citing *Overstreet v. TRW Commercial Steering Div.*, 256 S.W.3d 626, 630 (Tenn. 2008)).

Code section 39-14-105(b)(1) is not ambiguous. Consequently, we decline the defendant's invitation to delve into the legislative history to ascertain a meaning beyond that contained in the language of the statute. "When the words of a statute are ambiguous or when it is just not clear what the legislature had in mind," this court is authorized to "look beyond a statute's text for reliable guides to the statute's meaning." *BellSouth Telecommunications, Inc.*, 972 S.W.2d at 673. "Where the statutory language is not ambiguous, however, the plain and ordinary meaning of the statute must be given effect." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808 (Tenn. 2007).

We must next determine whether aggregation of the thefts in this case was appropriate under the terms of Code section 39-14-105(b)(1). We conclude that it was. On five separate occasions, the defendant entered two different Target stores and stole fitness trackers. On each occasion, the defendant worked the fitness trackers free of theft deterrent devices before placing them behind other merchandise on a nearby shelf. He then walked around until the coast was clear before returning to retrieve the merchandise. Then he concealed the purloined merchandise and left the store. The defendant wore nearly identical clothing during each of the offenses. After taking the fitness trackers from Target without paying for them, he sold them to Red Rhino. In our view, this

evidence established that each of the separate thefts arose "from a common scheme, purpose, intent or enterprise." *See* T.C.A. § 39-14-105(b)(1).

## *II. Evidentiary Issues*

The defendant next contends that the trial court erred by permitting witnesses "to testify that they had prior dealings with" the defendant. He argues that the "multiple incidents of blatant, repeated, intentional violations of Rule 404(b)" entitle him to a new trial. The State asserts that the trial court committed no error.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury's convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than upon the strength of the evidence. *State v. Thacker*, 164 S.W.3d 208, 239 (Tenn. 2005). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. The rule specifies three prerequisites to admission:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court must find by clear and convincing evidence that the defendant committed the other crime or bad act. *Id.*, Advisory Comm'n Comments; *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997); *State v. Parton*, 694 S.W.2d 299, 303 (Tenn. 1985).

When the trial court substantially complies with the procedural requirements of Rule 404(b), this court will overturn the trial court's ruling only when

there has been an abuse of discretion. *See Thacker,* 164 S.W.3d at 240; *see also DuBose,* 953 S.W.2d at 652. If, however, the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *See id.*

### A. Mr. Smith's Testimony

During Mr. Smith's direct examination testimony, the prosecutor asked Mr. Smith whether he could identify the person who had taken the fitness trackers from the Parkside Drive Target, and Mr. Smith indicated that that person was the defendant. Defense counsel objected to the identification, saying, "[T]hat identification is based solely on a picture and I don't believe he's qualified to . . . do that." The prosecutor replied, "It's not, but I will let him explain how he was able to identify him." Mr. Smith then identified the defendant by name and testified that he had seen the defendant's photograph, had seen the defendant on the store's video surveillance recording, and had observed the defendant in person, explaining, "I have seen him in person ten feet away from me." The defendant objected again to the identification, and the court overruled the objection. When the prosecutor asked the witness to explain when he had seen the defendant in person, Mr. Smith testified that on May 12, 2014, he was "in the area doing my PIT log" when he observed the defendant on video surveillance in the sporting goods area. Mr. Smith went to the area where he had seen the defendant and "proceed[ed] to watch [the defendant] go through his process of how he had been taking the [fitness trackers]. I was about ten feet away from him behind him watching this process." Mr. Smith said that the defendant abandoned his task when another customer approached. Mr. Smith then followed the defendant to his car and took down the license plate number.

Following this testimony, the defendant objected on Rule 404(b) grounds and requested a curative instruction. The trial court agreed and instructed the jury that it could consider the testimony only for its impact on Mr. Smith's ability to identify the defendant. The defendant did not request a jury-out hearing pursuant to Rule 404(b)(1) and did not object after the curative instruction was given.

During cross-examination, the defendant questioned Mr. Smith about why he had waited several months to report the thefts. In response to a question on redirect examination about the reporting delay, Mr. Smith indicated that he had waited until he was able to identify the defendant as the perpetrator, which was "when the attempt was made". The defendant objected, and the trial court sustained the objection and ordered the State to rephrase its question.

In our view, the trial court committed no error with regard to Mr. Smith's testimony. The trial court issued a curative instruction at the defendant's request following the revelation during Mr. Smith's direct examination testimony. The defendant

cannot be heard to complain about the trial court's failure to hold a jury-out hearing on the issue because he failed to request one. Finally, the court sustained the defendant's objection to a second revelation during redirect examination. The defendant is not entitled to relief on the basis of this testimony.

### B. Mr. Elliott's Testimony

The State asked Mr. Elliott if he could identify the defendant, and Mr. Elliott testified that he could, adding, "[T]here were three other times where I had recoveries on [the defendant]." The defendant objected, and the prosecutor indicated that she was surprised by Mr. Elliott's response. The trial court sustained the defendant's objection and provided the following instruction to the jury:

> Ladies and gentlemen, you are to disregard the last response that was given. Whether there is the belief that [the defendant] was involved or not in involved in any other instance at this store other than the 4-30 incident that we just discussed, you are not to consider that. You may consider it for other limited purposes such as identity but not for any other purpose.

After the trial court provided this instruction, the State asked Mr. Elliott how he could identify the defendant, and Mr. Elliott testified that he had seen the defendant in person on three previous occasions. The defendant did not object to this testimony and did not ask for a jury-out hearing.

Again, we conclude that the trial court committed no error.

### C. Testimony of Detective Epps

When the State asked Detective Epps where he was employed, he indicated that he was a member of the "repeat offender squad" of the Knoxville Police Department. The defendant objected and asked for a mistrial based upon what he characterized as the State's repeated, intentional violations of Rule 404(b). The trial court overruled the objection to Detective Epps's testimony about his current duty assignment and denied the defendant's motion for a mistrial.

In our view, the trial court did not err by refusing to exclude Detective Epps's testimony about his current duty assignment. The detective did not testify that the defendant was a repeat offender, only that he was himself assigned to the repeat offender squad at the time of trial.

*D. Motion for Mistrial*

The defendant moved the trial court for a mistrial once after Mr. Elliott's testimony and again after Detective Epps's testimony. The trial court denied both motions.

We find no abuse of discretion in the trial court's decision to deny these motions for mistrial. *See State v. Nash*, 294 S.W.3d 541, 546 (Tenn. 2009). "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). ("In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). Here, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250.

*III. Brady v. Maryland*

The defendant asserts that the trial court erred by refusing to grant a mistrial after Mr. Adams indicated that he had records of the defendant's sales at Red Rhino that included a copy of the defendant's driver's license. He argues that the State's failure to disclose the records prior to trial violated the tenets of *Brady v. Maryland* and that the erroneous failure to disclose caused defense counsel to claim during his opening statement, erroneously, that records of the sales to Red Rhino did not actually identify the defendant as the seller.

During Mr. Adams' direct examination, the prosecutor asked Mr. Adams if he had records of the defendant's sales of fitness trackers to Red Rhino, and Mr. Adams indicated that he did. In response to further questioning, Mr. Adams indicated that the records included photocopies of the defendant's driver's license. The defendant objected to the admission of the records, citing the State's failure to disclose them prior to trial. The prosecutor indicated that although the State had subpoenaed Mr. Adams and the records in question, it had not collected the records prior to trial and that the records had remained within the exclusive control of Red Rhino. Upon further inquiry by the trial court, Mr. Adams indicated that he had shown the records to the prosecutor during the first trial setting but that the State had not examined the records in detail and had not collected the records from him. The defendant asserted that the State's failure to disclose

the records had caused defense counsel to rely on the records from the LEIDs database, which records indicated that many of the sales to Red Rhino were conducted by an African American man named Denton Jones. He used this information to indicate to the jury during opening statement that this was a case of mistaken identity. Defense counsel argued that the only appropriate remedy in this situation was a mistrial.

The trial court thoroughly chastised the prosecutor for failing to disclose the existence of the records when she knew that she intended to rely on them in her case in chief. The court implied that it was disingenuous of the prosecutor to refuse to collect the records ostensibly to avoid having to provide them to the defense. Although the court indicated frustration with the prosecutor's attempt to "hide the ball," it ultimately concluded that no discovery violation or *Brady* violation had occurred because the records were equally available to both parties. The court also expressed concern about the position in which defense counsel had been placed because of the State's failure to disclose the records but denied the defendant's motion for a mistrial, concluding that the defendant had failed to establish a manifest necessity for a mistrial.

"It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *United States v. Agurs*, 427 U.S. 97 (1976); *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Indeed, the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a due process violation via the suppression of evidence, the defendant must establish that (1) he "requested the information (unless the evidence is obviously exculpatory, in which case the [S]tate is bound to release the information whether requested or not)," (2) "the State suppressed the information," (3) "the information was favorable to" his case, and (4) "the information was material." *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). "Evidence 'favorable to an accused' includes evidence deemed to be exculpatory in nature and evidence that could be used to impeach the [S]tate's witnesses." *Johnson*, 38 S.W.3d at 55-56 (citing *State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995); *State v. Copeland*, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

> Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine

confidence in the outcome."

*Ritchie*, 480 U.S. at 57 (citations omitted); *see also Bagley*, 473 U.S. at 682.

Importantly, "*Brady* obviously does not apply to information that is not wholly within the control of the prosecution." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998); *see State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The State has no duty "'to disclose information that the defendant already possesses or is able to obtain'" or "which is not possessed by or under the control of the prosecution or other governmental agency." *Jordan v. State*, 343 S.W.3d 84, 96 (Tenn. Crim. App. 2011) (quoting *Marshall*, 845 S.W.2d at 233). The State is also under no obligation "to seek out exculpatory evidence not already in its possession or in the possession of a governmental agency." *Marshall*, 845 S.W.2d at 233 (citing *United States v. Xheka*, 704 F.2d 974, 982 (7th Cir. 1983)). When the defendant knows or should know "'the essential facts permitting him to take advantage of any exculpatory information,'" or when "'the evidence is available . . . from another source,'" there can be no *Brady* violation "because in such cases there is really nothing for the government to disclose." *Coe*, 161 F.3d at 344 (quoting *United States v. Clark*, 928 F.2d 733, 738 (6th Cir. 1989)). "When exculpatory evidence is equally available to the prosecution and the accused, the accused 'must bear the responsibility of [his] failure to seek its discovery.'" *Marshall*, 845 S.W.2d at 233 (quoting *United States v. McKenzie*, 768 F.2d 602, 608 (5th Cir. 1985)).

Although we have concerns about the circumstances surrounding the prosecutor's refusal to examine and collect the records at issue prior to trial, especially when she was aware that the information in the Red Rhino records contradicted the information in the LEIDs records, the fact remains that the challenged evidence was not within the exclusive control of the prosecution and was instead equally available to both the defendant and the State through the use of compulsory process. The State indicated prior to trial that it intended to present Mr. Adams as a witness and that it had subpoenaed the records from Red Rhino for trial. Nothing prevented the defendant from interviewing Mr. Adams and examining the records prior to trial. Moreover, and perhaps most importantly, there is no indication that the Red Rhino records actually contained exculpatory information. In fact, the records tended to inculpate the defendant even more than the records contained in the LEIDs database. In consequence, the defendant is not entitled to relief.

With regard to the defendant's motion for mistrial, we note that our review of this issue is hampered by the absence of the opening statements from the record on appeal. The defendant, as the appellant, bore the burden to prepare an adequate record for appellate review, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), and, in the

-12-

absence of an adequate record, this court must presume the trial court's ruling was correct, *see State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Without the benefit of the defendant's actual opening statement, we cannot effectively evaluate the impact of the opening statement in light of the evidence adduced at trial. Thus, we must presume that the trial court did not abuse its discretion by failing to declare a mistrial based upon the failure to disclose the Red Rhino records.

*IV. Sufficiency*

The defendant next contends that the evidence was insufficient to support his conviction, alleging that the State failed to establish value. He reiterates his earlier argument that the value of the property taken was improperly aggregated and also argues that neither Mr. Smith nor Mr. Elliott was qualified to testify as to the value of the fitness trackers taken during each theft. The State avers that the evidence was sufficient. We agree with the State.

As an initial matter, we have previously disposed of the defendant's challenge to the aggregation of the thefts in this case, and we will not rehash the issue here.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103(a). Property is defined as "anything of

-13-

value, including, but not limited to, money, real estate, tangible or intangible personal property, including anything severed from land, library material, contract rights, choses-in-action, interests in or claims to wealth, credit, admission or transportation tickets, captured or domestic animals, food and drink, electric or other power." *Id.* § 39-11-106. In most theft cases,

> "Value":
>
> (A) Subject to the additional criteria of subdivisions (a)(36)(B)-(D), "value" under this title means:
>
> > (i) The fair market value of the property or service at the time and place of the offense; or
> >
> > (ii) If the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense;
>
> . . . .
>
> (C) If property or service has value that cannot be ascertained by the criteria set forth in subdivisions (a)(36)(A) and (B), the property or service is deemed to have a value of less than fifty dollars ($50.00);

*Id.* § 39-11-106(36)(A),(C).

In this case, both Mr. Smith and Mr. Elliott testified that they were charged with keeping track of those items inside the Target that had both a high retail value and a high risk of theft. Both maintained logs of these items, which included the types of fitness trackers taken by the defendant, as well as item numbers and prices of each item on the list. Both witnesses testified to the manufacturer's suggested retail price of the fitness trackers at the time they were taken. Their testimony established that the total value of all the fitness trackers taken during the five thefts was $1,062.90. Although the defendant asserts that neither witness was qualified to testify about the value of the fitness trackers, he failed to support his assertion with any argument or citation to appropriate authorities. The evidence adduced by the State was sufficient to support the jury's verdict.

-14-

## V. Cumulative Error

Finally, the defendant asserts that the cumulative effect of the errors deprived him of his constitutional rights to due process and a fair trial. Having considered the issues presented on appeal and having concluded that the defendant is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

## Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE